Myrtle L. PHILLIPS,
Petitioner-Appellant,

v.

Louie L. WAINWRIGHT, as Secretary,
Department of Offender Rehabilitation,
State of Florida, Respondent-Appellee.

No. 79–1046.

United States Court of Appeals,
Fifth Circuit.

Aug. 20, 1980.

Bennett H. Brummer, Public Defender, Elliot H. Scherker, Asst. Public Defender, Eleventh Judicial Circuit of Fla., Miami, Fla., for petitioner-appellant.

Steven R. Jacob, Asst. Atty. Gen., Miami, Fla., for respondent-appellee.

Before COLEMAN, Chief Judge, TJO-FLAT and HILL, Circuit Judges.

TJOFLAT, Circuit Judge:

Myrtle L. Phillips was convicted of second degree murder in March 1976 after a jury trial in a Florida state court. She was sentenced to imprisonment for life. Following an unsuccessful appeal, she brought this habeas corpus proceeding, pursuant to 28 U.S.C. § 2254 (1976), in the district court. Phillips' petition challenges the constitutional permissibility of the Florida trial court's refusal to admit into evidence expert testimony that Phillips had offered in support of her defense of self-defense. Because we find no constitutional error in the evidentiary ruling, we affirm the district court's denial of habeas corpus relief.

I

The evidence that the State of Florida introduced against Phillips in its case-in-

chief is essentially undisputed. On October 5, 1975, Officer Larry Green of the Dade County Public Safety Department was directed by the police dispatcher to a Seven-Eleven store in Dade County. Beneath a public telephone that was mounted just outside the front door of the store, Green found the body of Myrtle Phillips' husband, James Phillips. James Phillips had died of stab wounds to his chest. He had been stabbed nine times with a butcher knife, which had been left implanted in his chest. He still clutched a hammer in his left hand. When Green asked the crowd of people that had gathered what had happened, Myrtle Phillips responded, "I did it. Yes, I did it." Exhibit I at 27.

Phillips was taken to the police station, where she waived her *Miranda* rights and submitted to an interview with Officer Charles Major of the Homicide Section. She told Major that she and her husband had begun to quarrel at about three o'clock that afternoon in the house trailer where they lived. During the argument, Mr. Phillips had grabbed her around the throat and shoved her down, causing her to bump her head against a coffee table. Someone, apparently one of the neighbors, called the police. Mr. Phillips went outside of the trailer, warded off the police officers, and then went back inside, where the dispute was rekindled. After the quarrel had continued for a while, Mr. Phillips grabbed a hammer and made a threatening gesture with it. He then left the trailer with his weapon, saying that he had to make a telephone call, and ran in the direction of the nearby Seven-Eleven store.[1] After about fifteen minutes, Mrs. Phillips followed him. She explained that she was worried about him because he had a heart condition; but she was also concerned about her own safety, so she took along a butcher knife to protect herself. She found Mr. Phillips talking on the telephone at the Seven-Eleven store. When he saw her approaching, he shouted at her, "Get away from me." She then heard him scream into the phone, "She's going to get me; she's going to get me." *Id.* at 77.[2] Undeterred, she demanded that he give her the hammer. Next, she told Major, her husband said that "he was going to take care of me, have me fixed," and then struck her on the arm with the claw of the hammer." *Id.* at 79. She responded, "I have a defender, too," and began stabbing him as he yelled into the phone, "She did it; she's killing me already." *Id.* After her husband had slumped to the ground, Phillips remained close by until the police arrived and took her into custody.

At the close of the State's case, the court ordered a recess and met with counsel in chambers. Defense counsel informed the court that the defense planned to introduce the testimony of four "doctors." Defense counsel explained:

> They will, basically, testify they examined her and they found that she had suffered epilepsy and she was on Thorazine and Dilantin; and pills of that category.

> Apparently, she knows the difference between right and wrong. However, they feel her judgment because of the epilepsy is impaired and she cannot in critical situations, times of stress, cope as other people would. In fact, she reacts a little different than the normal person.

> They will further testify in their opinion that she acted in this particular case in self defense.

> .    .    .    .    .

> [T]hey believe that she acted—in her own mind she felt she was in danger of great bodily harm and it was because of

---

1. Major testified that Phillips had initially told him that her husband had taken with him a butcher knife as well as the hammer, and that she had wrestled it away from him during a tussle at the store. Shortly afterwards, she admitted that it was she who had taken the knife to the scene of the stabbing.

2. James Phillips had telephoned the Dade County Department of Public Safety, and he was talking to a police officer when his wife appeared. The entire conversation was tape recorded. The prosecution introduced the recording into evidence, and it was played for the jury. It was not transcribed for the record, however.

that danger she perceived in her mind as the reason why she killed  .   .  . .

*Id.* at 127.

After this proffer, the prosecutor objected that the expert testimony would be incompetent. *Id.* at 128. To permit the doctors to give their opinions about the issue of self-defense, he argued, would be to allow them to testify as "expert lawyers and judges." *Id.* at 130. The court agreed with the prosecutor:

There are a lot of things a psychiatrist may testify about. I do not know what other realms these four gentlemen would be involved in, but the question of self defense is one peculiarity [sic] within the jury.

This jury should hear if her feelings are such, but she is in a perfect position to testify, if she so desires, to her feeling.

However, I am not inclined to allow any professional witness to come in here and resolve the questions of fact that are here for the purpose of this jury's determination.

*Id.* at 135–36.

The discussion of the Defense's proffer concluded as follows:

[DEFENSE COUNSEL]: [I]s the Court granting the State's motion to exclude?

THE COURT: Insofar as that testimony that this lady acted in self defense, yes. I do not want the doctors' opinions in that regard.

[PROSECUTOR]: I do not object, for the record, to them testifying that she is an epileptic and she has been on medication, and that she has had a prior mental history.

However, my only objection goes to their testifying, of their opinion, that she acted in self defense.

[DEFENSE COUNSEL]: The items that the prosecutor mentioned will be the predicate before they would give their opinion. I would establish that predicate and then ask them for their opinion.

THE COURT: Proceed.

[DEFENSE COUNSEL]: Your Honor, since the Court has ruled, I will not further belabor the Court with legal argument, although I have additional cases to support. I think the Court has the issues and has ruled. I will not belabor that.

*Id.* at 138–39.

Immediately following the conference in chambers, the defense rested its case without presenting any evidence. Defense counsel had decided not to put Myrtle Phillips on the stand, he explained to the judge, because "[s]he does not understand my own questions, and I do not believe she would be a good witness." *Id.* at 140.

The court's charge to the jury included an instruction on self-defense. The issue of self-defense had been adequately raised, the court apparently concluded, by the post-arrest statement that the State had introduced into evidence.

## II

Phillips argues that she is entitled to habeas corpus relief on the ground that the trial court's ruling excluding the testimony of her expert witnesses denied her the constitutional right to compulsory process. The compulsory process argument is inapposite, however; properly framed, her claim is that the exclusion of the expert testimony rendered her trial fundamentally unfair, in violation of the due process clause.

She bases her compulsory process claim primarily on *Washington v. State of Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). There, the Supreme Court reversed the murder conviction of Jackie Washington because the Texas trial court had refused to permit him to introduce the testimony of Charles Fuller, who had previously been convicted as a co-participant in the same murder. The trial court had excluded Fuller's testimony on the authority of two Texas statutes providing that persons charged or convicted as principals, accomplices, or accessories in the same crime could not testify for one another, although they could be called as witnesses by the state. In analyzing Washington's assertion of error, the Supreme Court first ruled that

a criminal defendant's sixth amendment right to have compulsory process for obtaining witnesses in his favor is applicable to the states through the fourteenth amendment. The Court then held that "the petitioner in this case was denied his right to have compulsory process . . . because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." *Id.* at 23, 87 S.Ct. at 1925.

Phillips urges that the psychiatric testimony she proffered at trial was "relevant and material" to her defense of self-defense; therefore, she reasons, the Court's analysis in *Washington* compels the conclusion that the Florida court's exclusion of her expert testimony denied her the right to compulsory process. In our view, she reads the *Washington* case too broadly. If she were correct, it would follow that a trial court's exclusion, for whatever reason, of *any* evidence offered by a criminal defendant would be subject to constitutional challenge under the compulsory process clause. The Supreme Court's reasoning in *Washington* plainly indicates that the Court did not intend such a far-reaching result.

The Texas competency statutes that the Court found unconstitutional in *Washington* absolutely precluded a criminal defendant's calling certain persons as witnesses, without regard to what those persons might testify. To apply the statutes, the trial court had only to consider the identity of the proposed witness. Since the substance of the excluded testimony was irrelevant to the workings of the statutes, a proffer would have been of no avail. In effect, then, a defendant against whom the statutes were applied found himself in the same situation he would have been in if he had been unable to bring the witness to the courthouse at all. In both circumstances the witness is personally "unavailable" to testify even though the substance of the testimony that the witness could provide would be unobjectionable. The Supreme Court's reversal of Washington's conviction

is apparently founded on the Court's recognition of this analogy between the operation of the Texas statutes and an outright denial of compulsory process.

■ In the present case, in contrast to *Washington*, the trial court's evidentiary ruling was not based solely on who the witnesses were. The trial court acknowledged, in rejecting defense counsel's proffer of their testimony, that "[t]here are a lot of things a psychiatrist may testify about . . . ., but the question of self defense is one peculiarity [sic] within the jury." *Supra* at 587. Evidently, the court barred the experts from testifying not because they were themselves incompetent—like Fuller, the rejected witness in *Washington* —but because the particular *testimony* that defense counsel had proffered would not be admissible. It is as if the Texas court in *Washington* had permitted Fuller to take the witness stand, but had then prevented him from answering questions on the ground that all his answers would be inadmissible hearsay. In neither this hypothetical nor in the case before us is the court's evidentiary ruling analogous to an actual denial of compulsory process. A compulsory process challenge, therefore, is simply not pertinent.

Stripped of its compulsory process raiment, Phillips' allegation of constitutional error must be viewed as a general due process challenge to an evidentiary ruling. As we said in *Nordskog v. Wainwright*, 546 F.2d 69 (5th Cir. 1977), "It is fundamental that federal courts possess only limited authority to consider state evidentiary rulings in a habeas proceeding by a state prisoner." *Id.* at 72. Our inquiry must be limited to determining whether the evidentiary ruling was so prejudicial " 'as to deny fundamental fairness to the criminal trial, thus violating the due process clause.' " *Woods v. Estelle*, 547 F.2d 269, 271 (5th Cir. 1977), *quoting Hills v. Henderson*, 529 F.2d 397 (5th Cir. 1976), *cert. denied sub nom. Hills v. Maggio*, 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976).

### III

To determine whether the Florida court's evidentiary ruling resulted in a denial of

fundamental fairness, it is necessary first to define as precisely as possible the nature of the excluded testimony and the basis of the court's ruling. The only contested issue at trial was whether Phillips had acted in self-defense. As the trial court instructed the jury, to establish self-defense under Florida law a person must show that there existed reasonable grounds for him to believe that "he [was] in imminent danger of death or great bodily injury" and that he actually held that belief when he acted. Exhibit I at 189. *See Raneri v. State of Florida*, 255 So.2d 291 (Fla. 1st Dist.Ct.App. 1971). In addition, the court charged:

A person cannot justify the killing of another on the ground of self defense unless he has used all reasonable means within his power and consistent with his own safety to avoid the danger without the necessity of such killing.

If attacked by another, even though the attack be wrongful, he has the legal duty to retreat  .  .  .  [unless] to do so would increase his own danger.

.  .  .  .  .

A person who by reason of threats or prior difficulties has reason to fear that he may be in danger of death or great bodily harm at the hands of another has the right to arm himself and go about his usual business or personal affairs. But a person may not justify the killing of another on the ground of self defense if, after arming himself, he renews the difficulty when he could have avoided it.

A person who kills another may not justify his act on the grounds of self defense unless he is reasonably free from fault in bringing about the difficulty.

.  .  .

On the issue of self defense you may consider the evidence of the character of the deceased.  .  .  .

You may also consider the relative physical abilities and capabilities of the defendant and the deceased.

*Id.* at 190–91. Phillips does not deny that these instructions accurately set out the Florida law.

In this habeas proceeding, Phillips contends that the sole purpose of the psychiatric testimony was to establish that she had acted with the requisite subjective state of mind—that is, that she had actually believed herself to be in imminent danger of death or great bodily injury. The proffer, however, indicates that the testimony would not have been so limited. Defense counsel informed the trial court that after stating their opinions concerning Phillips' mental condition and medical history, the expert witnesses "will further testify .   . that she acted in this particular case in self defense." *Supra* at 586. While the debate concerning the admissibility of the expert testimony is somewhat muddled, we think that a fair reading of the record reveals that the trial court flatly rejected only defense counsel's proposal that the experts be permitted to state their conclusion that Phillips had "acted  .   .   . in self defense." This is most evident in the court's statement that "[t]here are a lot of things a psychiatrist may testify about  .   .   . , but the question of self defense is one peculiarity [sic] within the jury," *supra* at 587, and in the court's response to defense counsel's question whether the court was "granting the State's motion to exclude": "Insofar as that testimony that this lady acted in self defense, yes. I do not want the doctors' opinions in that regard." *Id.* at 587.

After the court had answered defense counsel's question, the prosecutor unambiguously indicated that he did not object to the experts' "testifying that she is an epileptic and she has been on medication, and that she has had a prior mental history." *Id.* Rather, his "only objection goes to their testifying, of their opinion, that she acted in self defense." *Id.* Thus, it appears that the defense was left with the opportunity to introduce expert testimony concerning Phillips' mental condition and medical history, so long as the testimony was limited to those matters. Defense counsel chose not to take advantage of this opening, however. He answered the prosecutor's statement with the remark that "[t]he items that the prosecutor mentioned

will be the predicate before they would give their opinion." By not pressing the matter any further, defense counsel confirmed the impression he had created that his principal purpose in calling the experts as defense witnesses would be to elicit their testimony that Phillips had acted in self-defense and that nothing short of permitting them to state that conclusion would make it worthwhile to put them on the stand.[3]

The state objected to the proffer on the ground that the doctors' testimony would be incompetent. The basis of the competency objection is obvious. As the court's charge to the jury on self-defense, *supra* at 589, indicates, the issue of self-defense comprises many considerations that are manifestly outside the area of expertise of a psychiatrist or psychologist. If the experts were to testify, "in my opinion, Myrtle Phillips was acting in self-defense when she killed James Phillips," they would be affirming not only that Phillips was likely to have had the requisite subjective state of mind, an opinion that their professional knowledge might well have qualified them to give, but also that Phillips' state of mind was reasonable, that she had taken adequate steps to avoid the danger, that it was not necessary for her to have retreated, et cetera.

Phillips has made no showing that it was "unfair" in *any* degree, much less "fundamentally unfair," for the trial court to have refused to permit her experts to state a conclusion that was clearly outside the scope of their professional expertise.[4] Therefore, we need not engage in the process of weighing the state's interest in applying its rules governing evidentiary competency against Phillips' interest in introducing the excluded evidence, *cf. Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), to conclude that the challenged evidentiary ruling did not violate Phillips' due process rights.

Accordingly, the district court's denial of Phillips' petition for habeas corpus relief is AFFIRMED.

---

**3.** If, in fact, defense counsel was willing at trial to introduce psychiatric testimony that would stop short of the self-defense conclusion, he had an obligation to communicate that point plainly. As the Florida Court of Appeals noted in its opinion affirming Phillips' conviction, under Florida law, "it is the responsibility of the party attempting to introduce the evidence, by his offer of proof, to make its purpose clear to the trial court . . . ." *Phillips v. State of Florida*, 351 So.2d 738, 740 (Fla. 3d Dist.Ct. App. 1977), *cert. denied*, 361 So.2d 834 (Fla. 1978). *Cf.* Fed.R.Evid. 103(a)(2).

**4.** Phillips urges that the Seventh Circuit's decision in *Hughes v. Mathews*, 576 F.2d 1250 (7th Cir. 1978), *cert. dismissed*, 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978), provides strong support for her contention that the Florida court's exclusion of her proffered expert testimony entitles her to habeas corpus relief. We must disagree. In *Hughes*, the petitioner had been tried for first degree murder in a Wisconsin court. At trial, he had tried to introduce psychiatric testimony that he was an "antisocial personality or a psychopath, and that an abnormal mental condition prevented him from forming the specific intent to kill." *Id.* at 1253. The trial court excluded the proffered testimony on the basis of a state statute creating a presumption, which could not be rebutted by psychiatric evidence, that a person intended the probable consequences of his acts. The Seventh Circuit granted the habeas corpus petition, holding that the statutory presumption had denied the petitioner due process in arbitrarily preventing him from introducing evidence of a sort that the state generally recognized as relevant and competent. The crucial distinction between *Hughes* and the present case is that the expert testimony excluded in *Hughes* was competent while the testimony excluded in this case was not.