**STATE of Tennessee, Appellee,**

v.

**David Franklin HOLCOMB, Appellant.**

**No. 81–157–III.**

Court of Criminal Appeals of Tennessee, at Nashville.

June 1, 1982.

Permission to Appeal Denied by Supreme Court Nov. 1, 1982.

David M. Himmelreich, Asst. Atty. Gen., Harold B. McDonough, Jr., Asst. Dist. Atty. Gen., Nashville, for appellee.

E.E. Edwards, III, Patricia Newton, Nashville, for appellant.

## OPINION

DAUGHTREY, Judge.

The defendant-appellant, David Franklin Holcomb, was indicted for aggravated rape and found guilty of the lesser offense of rape. As a result, he was sentenced to six

to ten years imprisonment. On appeal he challenges (1) the sufficiency of the evidence to support the jury's verdict; (2) the trial court's limitation on the admissibility of expert testimony offered by the defendant; (3) efforts by the State to show that the victim contracted gonorrhea as a result of her contact with the defendant; (4) the trial court's ruling on the admissibility of an extrajudicial statement made by the victim's husband; (5) the introduction of the defendant's prior criminal convictions and evidence of prior bad acts; and (6) the trial court's rulings on several special requests for jury instructions that were submitted by the defendant. We find no reversible error in connection with these issues, and we therefore sustain the conviction.

There was little or no material dispute between the prosecution and defense concerning many of the preliminary facts in this case. Moreover, the defendant conceded that on December 14, 1979, he had engaged in sexual intercourse with the victim while parked in his truck in a deserted area of Davidson County, but he claimed that the act was consensual in nature. The jury, however, accepted the victim's testimony that she had been forced to submit to the defendant by threat of bodily harm.

Given the jury's verdict, the evidence in the record must be reviewed by this court in the light most favorable to the State to determine whether it meets the standard of Rule 13(e), Tennessee Rules of Appellate Procedure. *See State v. Patton,* 593 S.W.2d 913, 916–17 (Tenn.1979), quoting *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). That evidence shows that on the evening of December 14, the victim, a 26 year old housewife and mother of two small children, left the children in her husband's care and drove toward a local shopping center intending to do some Christmas shopping and perhaps to meet several friends for a drink afterwards. On the way to the shopping center, she developed car trouble and was forced to pull her car off to the side of Donelson Pike.

Within a short time, the defendant pulled over in his pickup truck and offered assistance. He told her he had no tools with him, but nevertheless worked under the hood for a while, trying to get the car to start. When his efforts were unavailing, she asked if he would drive her to a telephone so that she could call someone to come and give her a ride home. The defendant agreed to do so. The victim specifically asked to be taken to a nearby Shoney's restaurant, located a mile or two down Donelson Pike in the direction the defendant was headed.

After driving a short distance, the defendant asked the victim if she knew where the nearest liquor store was located. Despite the fact that she told him there was one across Donelson Pike from the Shoney's restaurant where they were headed, the defendant turned off Donelson Pike onto Murray Lane and in a circuitous fashion headed back in the direction from which they had just come. In this process he next turned off Murray Lane and onto a backroad, raising the victim's suspicions about his intentions. She began talking nervously, saying anything that came into her head and "trying to break the silence at that point because I was in fact very scared, very nervous." She talked about her Christmas shopping plans, her plans to meet friends for a drink, and a disagreement she had had with her husband that morning.

The victim's small talk apparently did not distract the defendant from his purpose, for he soon turned the truck off the road and into a field. At this point, the victim became aware for the first time that there was no handle on the inside of the door on her side of the truck, which was a 1958 model. Seeing no escape, she said she immediately began screaming, begging the defendant "not to do this." She testified that she was "very scared because I knew what was fixing to happen..." and there was no way to escape from the truck. Furthermore, there were no houses in the area, and the only business, a rock quarry, was closed at the time.

After the defendant brought the truck to a halt, he grabbed the victim and warned her not to struggle, saying that if she did, he would hurt her. She testified that she

initially tried to resist him, but eventually submitted to his advances out of fear. The defendant laid her back on the seat of the truck and tried to remove her clothes. He succeeded in partially disrobing her and proceeded to have intercourse with her. Afterwards the defendant got out of the truck on the passenger side (the victim was unable to explain how, since she had seen no handle on the inside of the door; when the truck was later located, the police found a pair of vise-grip pliers attached to the door where a handle would ordinarily be). The victim said that the defendant cleaned himself off with a rag (she was in the midst of her menstrual period) and left the rag in the field, where it was found by her husband a day or two later.

The defendant then told the victim that he had lied to her earlier about not having any tools and offered to return to her car and get it started so that she could go home. They drove back to Donelson Pike where the defendant in fact got the victim's car started. Leaving her there, he then drove off down Donelson Pike.

The victim began the drive home, but her car started "acting up" again, and she decided instead to drive directly to her mother's house, a short distance away. The car stalled for good a few blocks from her mother's residence, and the victim left it there, walking the rest of the way. When she got to the house, her brother was there. The victim reported that she had been raped and asked her brother to take her home, where she likewise reported the incident to her husband. Her brother called the police, and later that night the victim was examined at a local hospital.

The examination revealed the presence of motile sperm in the vagina, signifying intercourse within the previous four hours. Tests also revealed the presence of gonorrhea, which was immediately treated and eradicated within a short period of time. The victim testified that to her knowledge she had not had gonorrhea prior to her contact with the defendant on December 14 and that neither she nor her husband had ever been treated for gonorrhea. She de-

nied having sexual relations with anyone except her husband. Medical personnel who testified at trial were unable to say for sure whether the victim had been infected with gonorrhea on December 14 or whether she had contracted it before that date.

Both the victim's brother and her husband testified that she was very upset, crying, and at times unable to talk after the episode on December 14. The victim's husband also testified that he had never had gonorrhea or been treated for it, and that his wife was his only sexual partner during this period of time.

Police officers testified that the victim subsequently identified the defendant from a large group of photographs as the person who had raped her on December 14. The police then went to Holcomb's home in an effort to locate a truck matching the victim's very specific description: an old model with a broken passenger window, an oil can on the floor board, a fake fur cover on the seat, no door handle, the ignition to the left of the steering wheel, a lowered tailgate, etc. They found the truck, just as the victim had described it, parked at the defendant's house. When they first talked to him, Holcomb denied any involvement in the incident, but he later admitted having had sexual intercourse with the victim on December 14. He maintained that the episode was wholly consensual, done "in return for him fixing her automobile."

The defendant testified in his own behalf at trial. The thrust of his testimony was in line with statements he gave police prior to trial, *i.e.*, that he had told the victim that she was "attractive" and "asked her if she would make love with me in return for me either fixing her car or towing her car." He said that he first denied involvement with the victim because he was asked about the matter in front of his wife, but said that he later told police the whole story. In many respects, however, the defendant's testimony was vague and self-contradictory as to the details of what occurred after the stranded woman got into his truck.

We conclude that the evidence, most of which is summarized above, made out a

clear-cut question of consent for the jury, and that by their verdict the jury rejected the defendant's theory and credited the testimony of the victim in this case. We have no hesitation in concluding that the record is sufficient to support that determination. However, the defendant claims in addition that certain favorable evidence was improperly kept from the jury, while other prejudicial evidence was improperly admitted, thus skewing the picture presented to the jury.

■ The defendant's principal complaint on appeal concerns the trial court's limitation on the scope of testimony by defense witness Eliott Ward, a clinical psychologist who had examined Holcomb after his arrest and prior to trial. Dr. Ward testified that he had administered several standard psychological tests to the defendant and that the results showed no appreciable abnormalties (or, in the expert's words, "no pathology"). The trial court ruled, however, that the witness could not go further and testify that based on his findings, it was his conclusion that the defendant was unlikely to have engaged in violent behavior of the kind with which he was charged. The defense was prepared to have the psychologist testify that when faced with screaming or other forms of resistance, the defendant's personality was such that he would be expected to desist rather than press on. The expert was also prepared to say that in his opinion the defendant's level of intelligence, while within normal range (Holcomb's I.Q. was measured at 91), was low enough that he lacked the "sophistication" necessary to perceive certain "social cues" and that he might interpret subtle resistance by a female in a sexual setting as "playfulness."

The trial judge disallowed this testimony, finding that it was irrelevant and incompetent to the extent that specific intent is not required in order to establish rape. The trial judge also found that the proffered testimony was incompetent on the ground that it would not materially aid the jury in reaching their determination. He thus declined to permit the witness "to predict what a man without psychological patholo-

gy would or wouldn't do in a given set of circumstances or to [give] an opinion as to what this defendant did or didn't do, would or wouldn't do...."

The defendant argues on appeal that this limitation on the scope of expert testimony violated his rights to compulsory process and to due process. As support he relies on *Hughes v. Mathews*, 576 F.2d 1250 (7th Cir.1978), *cert. dismissed*, 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94, a case in which a state prisoner's conviction was set aside as the result of a federal habeas corpus proceeding. Hughes had shot and killed his estranged wife and a neighbor who tried to intervene in their dispute. He defended on the ground that he lacked the requisite specific intent for first degree murder. To support this theory Hughes offered a psychiatrist to testify that he was psychopathic and thus unable to form the specific intent to kill. The trial court excluded this expert testimony, and the defense offered no other proof. Hughes was found guilty of first degree murder.

In federal court Hughes argued that the exclusion of the psychiatric evidence violated his constitutional rights, and the appeals court agreed. One basis for the decision rested on what the court perceived to be a criminal defendant's constitutional right to present evidence in his own behalf, provided that the excluded evidence meets a three-step test. Under the *Hughes* test, the trial court must

> ... first determine whether the evidence offered by the defense is relevant; second, determine whether the evidence is competent; and third, if the evidence is found to be both relevant and competent, examine the reasons for the rule excluding the evidence to determine if the rule is arbitrary.

*Id.* at 1256.

The *Hughes* court further noted that whether the evidence in question is relevant and competent is a matter of state law. *Id.* at 1256 n. 13. The court then applied its three-step test and found that in Wisconsin psychiatric testimony is relevant and competent on the question of whether the de-

fendant had the capacity to form specific intent. The *Hughes* court found that the state could not sufficiently justify the exclusion of the evidence in question and held that the conviction must be set aside.[1]

The State argues that the evidence involved here is neither relevant nor competent under the standard utilized in *Hughes.* The State also cites to *Phillips v. Wainwright,* 624 F.2d 585 (5th Cir.1980), as a similarly distinguishable case and one with a fact situation closer to the case at bar than is *Hughes.* In *Phillips* the defendant and her husband engaged in a physical altercation which led to his death by stabbing. At trial the defense sought to introduce psychiatric testimony to establish that Phillips acted with a subjective state of mind indicative of self-defense. The trial judge was willing to let the experts testify concerning Phillips's mental condition and her medical history, but refused to allow them to state their conclusion that she acted in self-defense. The *Phillips* court held on appeal that this ruling was proper, saying that "the issue of self-defense comprises many considerations that are manifestly outside the area of expertise of a psychiatrist or psychologist." *Id.* at 590. Because the proffered expert testimony was not competent, the court refused relief under the *Hughes* rule.

■ We likewise conclude that adoption of the *Hughes* test would not require reversal in the instant case. In Tennessee the relevancy and competency of expert testimony is within the discretion of the trial court. *See, e.g., Hicks v. State,* 533 S.W.2d 330, 332 (Tenn.Cr.App.1975). Not all psychiatric testimony concerning a defendant's mental condition is relevant and competent. *See, e.g., Matlock v. State,* 566 S.W.2d 892, 894 (Tenn.Cr.App.1978) in which it was held that the trial court in a

rape prosecution did not err in limiting the testimony of an expert who offered to testify not to defendant's capacity to appreciate wrongfulness of his conduct or to his capacity to conform his conduct to the requirements of the law, but merely to the fact that defendant was mildly mentally retarded.

■ In the instant case the defendant argues that Dr. Ward's testimony was relevant to the issue of specific intent. However, the trial court properly ruled that proof of specific intent is not necessary to establish the crime of rape. *Walden v. State,* 178 Tenn. 71, 156 S.W.2d 385, 387 (1941). Moreover, we find that the testimony in question was not competent on the issue of general intent. Dr. Ward's conclusions that Holcomb would not act in a certain way under certain circumstances and that he lacked the "sophistication" to recognize resistance seem more a matter of speculation than of science. Under these circumstances, we hold that the court did not abuse its discretion in excluding portions of Dr. Ward's testimony.

■ The defendant next complains that he was unfairly prejudiced by the State's attempt to establish aggravated circumstances through proof that the victim contracted gonorrhea from him. Such evidence was relevant under the provision of T.C.A. § 39–3702 which was in effect at the time of the crime and which equated the transmission of venereal disease with the infliction of "personal injury" necessary to elevate the offense of rape to that of aggravated rape.[2] The defendant argues, however, that the State acted in bad faith in this regard, because although the prosecution could establish that the victim had gonorrhea on December 14, the State made no effort to prove that the defendant also

---

1. Subsequent to *Hughes,* the Wisconsin Supreme Court ruled that as a matter of Wisconsin law, psychiatric evidence as to the capacity to form intent was neither competent nor relevant and was therefore properly excludable. *Steele v. State,* 97 Wis.2d 72, 294 N.W.2d 2 (1980). Thereafter a federal district court in Wisconsin held under factual circumstances

similar to *Hughes* that it was bound by the state court's decision in *Steele.* Applying the three-step analysis of *Hughes,* the court ruled that the defendant had not been deprived of his constitutional rights. *Muench v. Israel,* 514 F.Supp. 1194 (E.D.Wis.1981).

2. *See* T.C.A. § 39–3703.

had gonorrhea on that date, or that he was necessarily the one who transmitted it to the victim.

In this case, we fail to find the kind or degree of bad faith that would require reversal of the defendant's conviction. The victim testified that neither she nor her husband had ever suffered from or been treated for gonorrhea prior to December 14, and that she had had no other sexual contacts beside her husband (and the defendant) during the relevant period of time. Her husband's testimony corroborated these statements. The only discrepancy in testimony concerned their most recent contact with each other, as discussed below.

While the State might profitably have sought to discover whether the defendant had gonorrhea at an early stage in the investigation, we know of no legal requirement that they produce proof of this nature. Moreover, evidence concerning his medical condition sometime *after* December 14, 1979, would not have been conclusive as to his status on that date. Defense counsel's argument that the State should have made a voluntary disclosure of their reliance on the venereal disease provision of the aggravated rape statute is also without merit. The names and affiliation of the public health officials who were involved in the testing procedures were listed on the indictment that was returned against the defendant in April 1980. Nonetheless, these witnesses apparently were not interviewed, nor were discovery motions filed by the defense until January 1981, shortly before trial. Under these circumstances the defendant cannot be heard to complain that he was unfairly surprised or that he had inadequate time to prepare to meet the State's proof regarding transmission of venereal disease under T.C.A. § 39–3702.

Moreover, the record shows that the defendant was successful in defending against this evidence, for the jury found him not guilty of aggravated rape. We must presume that this verdict resulted from the State's inability to present proof beyond a reasonable doubt that the victim's gonorrhea was caused by her contact with Hol-

comb. As the State points out, the defendant's conviction of the lesser offense renders moot his complaint with regard to the sufficiency of the proof to establish the greater offense. *Shadden v. State,* 488 S.W.2d 54, 62 (Tenn.Cr.App.1972), *cert. denied,* 411 U.S. 909, 93 S.Ct. 1538, 36 L.Ed.2d 199. Beyond this, we reiterate our conclusion that the State's proof on this matter was initially sufficient to take the question to the jury, even if it was ultimately found to be insufficient to support the State's theory. Hence there was no unfair prejudice to the defendant and no reversible error in connection with this issue.

■ The victim told medical personnel on December 14, 1979, and later testified at trial that the only sexual relations she had had since the birth of her second child in September 1979 had occurred two weeks prior to the episode with Holcomb. She said that at that time she had engaged in sexual intercourse with her husband, but he testified that he had not had relations with his wife since before the baby was born. The defendant seized on this discrepancy, arguing that it supplied the motive for the victim's accusation against him (apparently the defense theory was that she had actually contracted gonorrhea from some unknown third party two weeks earlier and had accused the defendant of rape in order to cover up this extramarital liaison). When defense counsel asked one of the investigating officers about the husband's statement to police concerning this matter, the prosecution objected on hearsay grounds, and the trial judge sustained the objection. We find no error in this ruling. The extrajudicial statement was obviously hearsay and does not constitute an exception to the rule as far as we are aware. As to the declarant the statement was a prior consistent one, and there was no proof of recent fabrication. The defendant's argument that the statement should have been admitted to impeach the victim's testimony does not change its hearsay nature. Moreover, after viewing the record as a whole, we cannot say that the exclusion of this evidence affected the outcome of the trial

or otherwise violated the defendant's right to fundamental fairness. *Compare and contrast Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). We thus decline to reverse on this basis.

 Nor do we find any error in the trial court's ruling on the admissibility of Holcomb's two prior felony convictions for possession of marijuana for resale. Both fell within the time limits of the rule set out in *State v. Morgan,* 541 S.W.2d 385, 388–89 (Tenn.1976), and the trial court found that the probative value of admitting this evidence outweighed its prejudicial effect, in terms of the defendant's credibility. There can be little doubt that the relative credibility of the defendant and the victim was the dispositive issue at trial. Moreover, on direct examination the defendant testified that both convictions "arose out of the same 'batch' of marijuana," and thus there was no error in permitting the State on cross-examination to establish that Holcomb had been arrested at two different times several weeks apart.

 The trial judge also permitted the State to ask the defendant's psychological expert if the defendant had admitted to having more than one "extramarital affair." Over defense objection, Dr. Ward answered the question in the affirmative. We find that this was proper rebuttal of the defendant's sworn testimony that following his marriage and prior to December 14 he had never had sexual relations with anyone except his wife and that the episode with the victim in this case was his first transgression of the bounds of matrimony. In view of the facts of this case, the question was highly relevant to the issue of Holcomb's credibility.

 Finally, we conclude that the trial court did not err in refusing to charge the jury on all the special requests submitted by defense counsel. The proposed charge concerning a "witness who testifies for revenge or personal vindication" was an adaptation of a federal jury instruction applicable to the testimony of an informer; it was not shown to be legally or factually applicable in this case. The next instruction that the trial court rejected, to the effect that rape is a crime that is "hard to disprove" and in general terms disparaging the testimony of a rape victim, was a direct quote from *King v. State,* 210 Tenn. 150, 357 S.W.2d 42, 46 (1962). However, as this court has previously cautioned, the fact that certain language appears in the text of an opinion does not make it necessary or even appropriate for inclusion in a jury charge. *See generally Henderson v. State,* 539 S.W.2d 843, 847–849 (Tenn.Cr.App.1976). The final two requests, relating to the weight to be given uncorroborated testimony in a rape case, are not accurate statements of Tennessee law and were properly rejected by the trial court for this reason. We find no error in the trial judge's rulings on the jury instructions.

For the reasons set out above, the judgment of the trial court is affirmed.

O'BRIEN and BYERS, JJ., concur.