# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 23, 2012 Session

## JONATHAN FORTENER v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Monroe County
### No. 11125    Amy Reedy, Judge

---

### No. E2011-02575-CCA-R3-PC - Filed May 10, 2013

---

The petitioner, Jonathan Fortener, appeals the Monroe County Criminal Court's denial of his petition for post-conviction relief. The petitioner was convicted of one count of second degree murder and sentenced to a term of twenty-five years in the Department of Correction. On appeal, he contends that the post-conviction court erred in denying the petition because trial counsel was ineffective in that he had reason to know of mitigating factors, failed to investigate those mitigating factors, and failed to hire an expert to present evidence of the mitigating factors at the sentencing hearing. The petitioner also faults the post-conviction court for failing to allow testimony at the post-conviction hearing regarding traumatic brain injuries. Following our review of the record, we affirm the denial of relief.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

W. Tyler Weiss, Madisonville, Tennessee, for the appellant, Jonathan Fortener.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Robert Steven Bebb, District Attorney General; and James Stunts, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual Background and Procedural History

The relevant facts underlying the petitioner's conviction, as recited by this court on direct appeal, are as follows:

The testimony at trial revealed that when Cynthia Fortener, the [petitioner's] wife, left for work on August 10, 2004, her three and a half month old son, Austin, appeared to be a perfectly healthy infant. He was well-nourished and well-developed. She left Austin with his father, the [petitioner], at about 2:15 p.m. Around 6:45 p.m., the [petitioner] called Mrs. Fortener saying Austin had fallen off the couch and that he did not know what to do. At Mrs. Fortener's direction, he called a pediatric nurse, who eventually told him to take Austin to the hospital. Mrs. Fortener returned home, and they took Austin to East Tennessee Children's Hospital in Knoxville. During the trip, Austin was inconsolable and screaming. Along the way, the couple concocted a story to explain how Austin got hurt. Rather than falling off the [petitioner's] chest while the two slept on the couch, which was their explanation at trial, they decided to say that Austin fell when he was alone on the couch and the [petitioner] was in the kitchen getting a drink. Either way, they said Austin fell from the couch and hit his head on the carpeted, but very hard, floor.

The severity of Austin's injuries did not match the Forteners' story. Austin had massive head injuries and extensive bleeding throughout his brain. He also had hemorrhages in the retinas of both eyes. Upon seeing these injuries and hearing the purported explanation, the physicians caring for Austin became suspicious. They believed Austin had in fact suffered from "shaken baby syndrome," a dangerous condition that arises in children who have been severely and violently shaken. They contacted law enforcement, who traveled to the hospital to investigate the situation.

Austin's injuries proved fatal. He was declared dead on the morning of August 12. The investigation quickly turned to the [petitioner], and he was eventually indicted on a charge of felony first degree murder for the death of his son.

*State v. Jonathan Fortener*, No. E2008-01775-CCA-R3-CD, 2010 WL 1241629 (Tenn. Crim. App., at Knoxville, Mar. 31, 2010), *perm. app. denied* (Tenn. Aug. 25, 2010).

At the trial, the State presented testimony from law enforcement officers, child services agents, and medical professionals in support of its case. A detective read into evidence the first statement made by the petitioner, which indicated that he had gone to get a glass of tea from the kitchen when he heard the victim fall off the couch and begin screaming. *Id*. Because of medical personnel's suspicions, the detectives asked the petitioner's wife to execute a waiver allowing them to search the family home, which was

done. Afterwards, the petitioner became a suspect and was again interviewed after waiver of his *Miranda* rights. *Id*. The following statement was dictated by the petitioner concerning the events directly after the victim fell from couch:

> I picked up Austin and I was scared. It all happened so fast. I don't know how I picked him up. I shook him and rocked him and tried to calm him down. I never got mad at him. I didn't take my time picking him up. He cried for about 15 minutes and then he acted like he wanted to go to sleep. I was trying to keep him awake and calm. I was bouncing him up and down in my arms. I did it for a while and then about 6:30 pm [sic] he started screaming again. I called my wife and the nurse and we brought him here. He cried all the way here. He didn't calm down until the dr's [sic] gave him medicine. I was in the back seat with him all the way up here. I would never hurt my boy, never. After it happened a friend of mine and her husband came by and I asked her if Austin looked OK because she has three kids and she said he looked fine, just acting like he wanted to rest. They were there right after it happened. I don't know where they live. I told them what happined [sic] and she looked at him and said he seemed fine, just tired. All he wanted to do was sleep. It wasn't anything purposeful, that boy is my life. It's a natural instinct to pick him up and I did as soon as I could. I don't know what too hard is. I picked him up when he fell and I walked around shaking Austin to calm him. I wasn't shaking him to hurt him. I was shaking him to console him. I probably picked him up more forcefully than I was shaking him. I never noticed his head snap or anything. He just wanted to close his eyes. I've always been told not to let a baby go to sleep if they've hit their head. If his head shook any it was from me rocking and bouncing him. No one else had Austin that could have hurt him. He was with me and my wife. The only thing I can think of is after he fell. He wouldn't even hold his head up. All he wanted to do was sleep. The only time his head bounced at all was when I was holding him trying to console him. It was after my wife got home and his head was hanging on my arm. It didn't matter how I held him, he still cried. His head flopped around while I was rocking him some. When I held him to my chest I put my hand on his head and it seemed to hurt him worse so I stopped putting my hand on his head. I was bouncing him pretty fast and his head was moving. I had my hand behind his head when I picked him up. When I was rocking him his head would just fall. I never held him out in front of me. I shook him very lightly not even under his arms or picking him up to try and keep him awake.

*Id*.

The two doctors who treated the victim were also called to testify. Both agreed that the injuries suffered by the victim were not in any way consistent with the explanation offered by the petitioner. *Id*. Each concluded that "violent" shaking would have been required to cause the injuries to the victim and that a reasonable person would have been concerned if that amount of force was applied to a child in their presence. *Id*. The medical examiner also concurred in those findings, stating that "only something like a car accident could provide an accidental cause for [the victim's] injuries." *Id*.

The petitioner was indicted by a Monroe County grand jury for one count of felony murder in the perpetration of aggravated child abuse. At trial, the State presented the above evidence. In addition, the defense presented two witnesses, as well as the petitioner himself. The first witness, a family friend, testified that he had been with the petitioner and the victim twice in the days leading up to the victim's death, and he observed no aggressive or violent behavior on the petitioner's part toward his son. *Id*. He related a prior incident where the victim had also fallen off the couch and had the breath "knocked" out of him, as well as the petitioner's ensuing panic.

The second witness to testify for the defense was the petitioner's wife. She related to the jury that the petitioner was staying home to care for the victim because the petitioner had been involved in a serious automobile accident in June 2004 in which he had suffered broken cheek bones and had his jaw wired shut. *Id*. She described the petitioner as a "great father," stating that she had never seen the petitioner become angry with the child or do anything to him which caused her concern. *Id*. She did, however, acknowledge that she had prior difficulties with the consequences of the petitioner's alcohol problem. She recalled once coming home from work to find the victim crying and the petitioner asleep. However, she stated that she did not believe that the petitioner was drinking the day the victim was injured. *Id*. She also testified that it was her idea to initially tell the police that the victim had fallen off the couch while the petitioner was in the kitchen, rather than that the victim had fallen off the petitioner's chest while the two were sleeping on the couch. She stated that she was afraid that the story would "look bad on" them. *Id*.

The final defense witness was the petitioner himself who stated that he was twenty-eight years old. He further related that he had dropped out of high school in the tenth grade after fathering his first child at the age of fifteen, as well as a second child when he was sixteen. *Id*. The petitioner acknowledged that he had a significant alcohol problem which began when he was seventeen. He related his involvement in a serious automobile accident in June 2004 when he was driving under the influence. He stated that he had shattered bones, broken his upper jaw, chipped his hip, and bruised his ankle. *Id*. The petitioner was unable to work and remained under a doctor's care at the time of the incident involving the victim.

He insisted that he had consumed no alcohol between the automobile accident and the victim's death. *Id.*

With regard to the circumstances of the events, the petitioner stated that he and the victim had been asleep on the couch with the victim on his chest. The petitioner asserted that the victim fell from his chest to the floor and began gasping for air. The petitioner stated that he picked up the victim and shook him in order to get him to breathe again. *Id.* He acknowledged that he had shaken the victim, but he testified that he was not aware that he was using that much force to cause the injuries. He stated that he was not mad at the victim, but rather he was trying to keep him awake because he thought the victim had hit his head. *Id.* The petitioner testified that he "did not think the shaking would hurt" the victim. *Id.*

After hearing all the evidence presented, the jury returned a verdict of guilty to the lesser-included offense of second degree murder. A sentencing hearing was held before the trial court, and the petitioner was subsequently sentenced to a term of twenty-five years in the Department of Correction. The petitioner filed a timely appeal to this court challenging only the sufficiency of the evidence, and this court affirmed the conviction. *Id.*

Thereafter, on March 28, 2011, the petitioner filed a timely pro se petition for post-conviction relief alleging that he had been denied his right to the effective assistance of counsel. Counsel was appointed, but no amended petition was filed. A hearing was later held at which the petitioner, his treating physician following his automobile accident, and trial counsel testified.

The petitioner testified that trial counsel was appointed to represent him in his first degree felony murder case. He stated that trial counsel only met with him on three occasions in the approximate year and a half prior to trial. He testified that once he made bail, he and his wife constantly called trial counsel's office but were unable to speak with him. The petitioner stated that he and trial counsel did not discuss strategy. He further testified that he supplied trial counsel with a list of witnesses who might help in the case, but the petitioner was not aware of the possibility of an expert testifying. The petitioner did acknowledge that trial counsel had explained the difference between felony murder and second degree murder, as well as the possible sentences that each offense carried. He also testified that they discussed the decision of whether he would testify at trial.

The petitioner also gave extensive testimony regarding an automobile accident he had been involved in about a month and a half prior to the victim's death. As a result of the accident, his lower jaw was broken, his cheek bones were shattered, his nose was broken, a bone in his hip was chipped, and he received a concussion. The petitioner indicated that he was in the hospital six days following the accident and underwent surgery. He testified

that plates were put into his cheeks, his mouth was wired shut for six weeks, and he was on crutches. He testified that he was given liquid hydrocodone for pain. The petitioner stated that he voluntarily took the medication as needed and as prescribed. The petitioner testified that he told trial counsel about his automobile accident, but trial counsel's response was only to say he was sorry. There was no discussion of using the information or resulting injuries as part of the evidence at trial or sentencing.

The petitioner specifically testified that he was not complaining about trial counsel's performance at trial. Rather, he faulted trial counsel only in the sentencing phase of the trial. According to the petitioner, trial counsel did not speak with him following trial before the sentencing hearing. Just prior to the sentencing hearing, trial counsel told the petitioner that he would probably receive a sentence of twenty years. The petitioner was not aware if trial counsel had ever investigated the automobile accident and its effects on the petitioner as possible mitigation evidence at sentencing. The petitioner, after research and reading, now felt that an expert should have been called to testify at sentencing regarding his intoxication due to his use of hydrocodone. The petitioner acknowledged that he had not consulted with a medical expert in reaching the conclusion that evidence of his concussion following the serious car accident and his ingestion of pain medication might have played a role in his receiving a different sentence.

Petitioner presented the testimony of Dr. William High, Sr., an oral and maxilla facial surgeon who performed the surgery on the petitioner's face following his automobile accident. Dr. High testified that he specializes in performing a full scope of facial surgery, facial reconstruction, joint surgery, and trauma. In addition to his expertise in surgery, Dr. High is also certified in advanced cardiac life support and advanced trauma life support. Dr. High testified that he often did a general assessment of trauma patients, but he made it clear that he was not a trauma surgeon. After a discussion of his qualifications, the trial court qualified Dr. High as an expert "to the extent that he has qualified himself."

Dr. High indicated that he was called in to the petitioner's case by the trauma team because of facial fractures discovered on a CT scan. After the consultation with the trauma team, Dr. High performed surgery on the petitioner on the third day of his hospitalization. The surgery involved using plates and screws to stabilize the fractures to the petitioner's face. According to Dr. High, the petitioner's case was relatively straightforward. He testified that he last saw the petitioner during a follow-up visit on August 23, 2004, at which time he gave the petitioner a prescription for twelve tablets of Lortab. He never saw the petitioner again because the petitioner failed to keep his next appointment. Dr. High also testified that the petitioner's file indicated only one other instance of a prescription being written for pain medication. On June 28, 2004, the petitioner was prescribed twenty-five Lortab pills upon his release from the hospital.

In response to questioning, Dr. High indicated that he was to some extent familiar with traumatic brain injury. He was clear, however, that patients had usually been evaluated for traumatic brain injury by the trauma team prior to his involvement. Dr. High acknowledged that he was not a neurosurgeon or a neurologist and that he relied heavily on the trauma team to make those determinations. He reiterated that he was familiar with traumatic brain injury, but he specifically testified that he was not an expert on the subject. In response to the State's objection, the trial court did not allow Dr. High to testify as an expert on the subject of traumatic brain injury.

Trial counsel testified that he was appointed to represent the petitioner. He stated that he met with the petitioner and his wife on several occasions in his office and a few more times in jail after the petitioner's bond was revoked for a subsequent DUI charge. Trial counsel testified that they spent a great deal of time discussing whether the petitioner would testify at trial. He felt that it was very important to the case. Trial counsel testified that he had reviewed the medical proof, which established a strong case of violent shaking. Trial counsel spoke with one of the doctors who had treated the victim and was aware that he was convinced that the victim had died as a result of violent shaking. He testified that the strategy at trial would be to try for a conviction of a lesser-included offense based upon the theory that it was accidental rather than knowing or intentional.

Trial counsel testified that the petitioner did tell him that he had been involved in a serious automobile accident. However, during his representation, trial counsel never had any questions regarding the petitioner's legal competency. He indicated that he was highly concerned about the petitioner's alcohol usage and whether the petitioner had been drinking while alone with the victim. Trial counsel could recall no discussion whatsoever with regard to the petitioner being on hydrocodone or suffering a brain injury. While trial counsel acknowledged that he might not have been aware of the severity of the petitioner's injuries, he was never concerned about the petitioner's mental state.

Contrary to the petitioner's testimony, trial counsel testified that he did in fact discuss the elements of the offense with the petitioner. He also testified that he reviewed the pre-sentence report with the petitioner prior to sentencing. Trial counsel stated that he had filed one mitigating factor based upon the petitioner's supportive family.

After hearing all the evidence presented, the post-conviction court found that the petitioner had failed to establish his entitlement to relief. This appeal followed.

**Analysis**

On appeal, the petitioner contends that he was denied his right to the effective assistance of counsel. Specifically, he contends that trial counsel was ineffective for failing to investigate the automobile vehicle accident in which the petitioner was involved shortly before the murder and the effects of that accident upon the petitioner and his mental state.

In order to obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103 (2010); *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner must prove allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010). Moreover, witness credibility determinations rest within the sound discretion of the post-conviction court. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

A criminal defendant has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and Article I, Section 9, of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. To prove ineffective assistance of counsel, a petitioner must prove both deficient performance and prejudice to the defense. *Strickland*, 466 U.S. at 687-88. Failure to satisfy either prong results in the denial of relief. *Id*. at 697.

A claim of ineffective assistance of counsel raises a mixed question of law and fact. *Burns*, 6 S.W.3d at 461; *Grindstaff*, 297 S.W.3d at 216. Consequently, this court reviews the trial court's factual findings de novo with a presumption of correctness, unless the evidence preponderates against the trial court's factual findings. *Grindstaff*, 297 S.W.3d at 216. But the trial court's conclusions of law on the claim are reviewed under a purely de novo standard with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

In denying relief, the post-conviction court specifically found:

-8-

I will say this for the record: [trial counsel] exhibited here today a small sample of just what an effective job he does as a lawyer. He has a clear [memory] of today as he did when he handled this case, the facts and circumstances surrounding the trial. I will put down an order, but for this Court to find [trial counsel's] representation of [the petitioner] to have been deficient in anyway I would have to separate myself completely from the facts of his performance because he did an excellent job in the Court's memory of defending [the petitioner] in all phrases [sic] of this case, in the trial, in the sentencing hearing. [Trial counsel] did an excellent job. . . .

Again, the petitioner's argument regarding ineffective assistance of counsel centers on trial counsel's failure to investigate the automobile accident and secure an expert to testify regarding the effects of the accident and prescribed pain medication upon the petitioner to testify at the sentencing hearing. He claims that this "evidence would have substantially strengthened his mitigation defense" because it affected the petitioner's "mental culpability and displays of remorse." The petitioner claims that because trial counsel was aware of the serious automobile accident, he should have been aware of these possible effects and had a duty to present the evidence in an attempt to get a shorter sentence. He asserts that the "[e]vidence of traumatic brain injury and of the effects of involuntary intoxication from narcotic pain medication would have served to substantially decrease [his] mental culpability at the time of [the victim's] death."

Following review of the record, we conclude that nothing in the record preponderates against the post-conviction court's findings that trial counsel was not deficient. Trial counsel testified that he was aware that the petitioner had been involved in an automobile accident. However, trial counsel was quiet clear that he saw no signs which indicated that the petitioner was suffering from the effects of the accident or that his mental state was compromised at the time of the murder. He was not aware that the petitioner was taking prescription pain medication, and his concerns centered on the petitioner's abuse of alcohol. At the post-conviction hearing, the petitioner offered no medical evidence, other than that which he claimed to have gleaned from his own personal research, which would have substantiated his claim with regard to the effects of such injury or medication. In fact, the petitioner never established that he had in fact incurred an actual traumatic brain injury. His own testimony and medical records offered no such reference or documentation.

Moreover, Dr. High's testimony appears to contradict the petitioner's assertion. Dr. High testified that the petitioner was only given a small amount of pain medication during this period. He further testified that there were usually no side effects from such medication other than confusion or tiredness. Thus, there was no supporting proof presented as to what effect this narcotic medication might have had on the petitioner's mental state.

-9-

As such, we agree with the State in its assertion that trial counsel cannot be deemed deficient for failure to secure a mental evaluation and obtain expert testimony in the absence of a factual basis to support a mental evaluation. The petitioner contends that, based upon his experience, trial counsel should have known to conduct an investigation into these matters. However, absent being made aware of the severity of specific injuries or ingestion of pain medication at the time of the murder, trial counsel cannot be faulted. On this record, the petitioner has simply failed to establish his entitlement to relief.

The petitioner also contends that the post-conviction court erred by refusing to allow Dr. High to testify at the post-conviction hearing with regard to traumatic brain injuries. He faults the court's determination that Dr. High was not an expert in that particular field, claiming that the evidence established that Dr. High had "sufficient knowledge and practical experience to testify as an expert about traumatic brain injury." The petitioner further contends that even if Dr. High was not allowed to testify as an expert, he should have been allowed to testify about his knowledge of traumatic brain injury even if such testimony would have been based on reliable hearsay.

It is well-settled that "the allowance of expert testimony, the qualifications of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." *State v. Rhoden*, 739 S.W.2d 6, 13 (Tenn. Crim. App. 1987) (citing *Murray v. State*, 377 S.W.2d 918, 920 (1964); *Bryant v. State*, 539 S.W.2d 816, 819 (Tenn. Crim. App. 1976); *State v. Holcomb*, 643 S.W.2d 336, 341 (Tenn. Crim. App. 1982)). This court will not disturb the trial court's ruling absent a clear showing that the trial court abused its discretion in admitting or disallowing expert testimony. *Id*.; *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002). This court will not find an abuse of discretion unless it "'appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *Stevens*, 78 S.W.3d at 832 (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)).

When assessing the admissibility of expert testimony, the trial court must first determine whether the witness is qualified by knowledge, skill, experience, training, or education to express an opinion within the limits of his or her expertise. *Stevens*, 78 S.W.3d at 834. This determination hinges upon whether the proposed expert's qualifications authorize him or her to give an informed opinion upon the fact or issue for which his or her testimony is being proffered. *Id*. A court is, in essence, asking whether the witness is an expert, either through knowledge, skill, experience, training, or education, in the area in which he or she is providing testimony. Tenn. R. Evid. 702.

Despite the petitioner's claim to the contrary, that standard was simply not met in this case. Dr. High himself specifically testified that he was not an expert in the area of traumatic brain injuries. While acknowledging a general awareness of them, he made clear that patients were usually evaluated and treated by the trauma unit prior to being placed in his care. There can be no abuse of discretion on the part of the post-conviction court when the witness himself denied expertise in the area.

Unless witnesses are qualified as experts, they may only offer opinions or inferences which are "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). On this record, we fail to see how this standard is met. We cannot conclude an abuse of discretion occurred in this matter. Dr. High did give testimony as to the petitioner's specific case and treatment which was administered by him after his release by the trauma unit. Dr. High's knowledge, according to his own testimony was that he relied upon those experts in the matter. The petitioner is entitled to no relief.

## CONCLUSION

Based upon the foregoing, the denial of post-conviction relief is affirmed.

_____
THOMAS T. WOODALL, JUDGE