WALDEN *v.* STATE.

(*Knoxville,* September Term, 1941.)

Opinion filed November 29, 1941.

ANDY HARTMAN and S. E. HODGES, both of Knoxville, for plaintiff in error.

ERNEST F. SMITH, Assistant Attorney-General, for the State.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

Plaintiff in error, Roy Walden, aged thirty-six, hereinafter referred to as defendant, was indicted in the Criminal Court of Knox County on September 17, 1940, for the rape of Nancy Ruth Sorrell, a child eight and one-half years of age. He was put to trial on October 22, 1940, at the conclusion of which the jury returned a verdict of guilty and fixed the punishment at death by electrocution. A motion for a new trial was seasonably filed and presented which the trial court overruled and thereupon entered judgment in accordance with the verdict of the jury. An appeal from said judgment was properly prayed, granted and perfected to this court.

Counsel for defendant entered pleas of "not guilty" and "insanity" in his behalf. In the presentation of the case in this court counsel did not insist seriously that defendant did not commit the crime, and could not do so for the reason that the uncontroverted proof establishes his guilt beyond any reasonable doubt, the testimony of defendant being that due to the condition of his mind caused by the use of intoxicants and drugs over a long period of time he was unconscious of having committed the offense.

Mr. and Mrs. Wesley Sorrell, father and mother of Nancy Ruth, lived at 4424 Kingston Pike, which is one and one-half miles west of the city limits of Knoxville in the vicinity of Bearden. Kingston Pike runs east and west. Mr. and Mrs. Sorrell had a place of business about 1000 feet east of their residence, the building being lo-

cated about 50 feet south of the Pike. They were engaged in selling sandwiches, beer and soft drinks. They had a helper by the name of Mrs. Blanche Whaley who resided in their home. Mr. and Mrs. Sorrell had one other child, a daughter eleven years of age, who at the time of this tragedy was on a visit to relatives in Cannon County.

The defendant lived with his father and mother on the Kingston Pike, their dwelling being two blocks west of the Sorrell home. The defendant had a divorced wife and three children who resided in Cincinnati, and from whom he had been separated about four years. He had known the Sorrells for several years, was a patron of their lunchroom, and, apparently, was familiar with the habits of the family.

On Sunday evening, September 8, 1940, Nancy Ruth was at the lunchroom of her parents until sometime between eight-thirty and nine o'clock when Mrs. Whaley accompanied her to her home preparatory to her retirement for the night. Mrs. Whaley returned to the lunchroom leaving Nancy Ruth alone with the doors unlocked. Mr. and Mrs. Sorrell did not consider it dangerous for the child to remain alone until their closing time at 2 A. M., since this was a good, quiet and orderly neighborhood.

The defendant drove up to this lunchroom about one-fifty on the morning of September 9, 1940, parked his automobile, came in and remained until the place was closed at 3:10 A. M. While there the defendant shot craps for small stakes with Mr. and Mrs. Sorrell and Henry Moneymaker, a brother of Mrs. Sorrell. Defendant lost what money he had, most of which was won by Moneymaker. It was agreed, in the presence of defendant, that the Sorrells, Moneymaker and Mrs. Whaley drive to the business section of Knoxville, a distance of

four miles, to eat some oysters. Defendant was not invited to go with them. According to the testimony of the four persons just named, the defendant while at the lunchroom purchased and drank three bottles of beer, was perfectly sober when they left, and at the request of Mr. Sorrell cranked his automobile for him on account of his batteries being weak; then cranked and entered his own car, the engine of which was running when they departed for Knoxville. Upon the return of the four parties to the Sorrell home at 4:20 A. M. Nancy Ruth was missing. The officers of Knox County were notified and a search for the child began.

About noon on the day that the crime was committed Nancy Ruth was discovered coming into her yard, as her mother expressed it, "in a very pitiful looking condition." Her body was covered with scratches, her legs were bleeding, dress muddy, and her hair matted and filled with beggar's-lice. She was in a dazed condition but with sufficient mind to relate to her mother what had transpired, giving a description of the man who assaulted her. She was taken immediately to Dr. Allen Webber who made a very careful and painstaking examination of the child's entire body, from which he testified positively that she had been attacked and that a male had unlawfully had carnal knowledge of her.

Nancy Ruth testified in detail as to this atrocious crime, the substance of which was that after retiring about nine o'clock she was awakened some time later by the defendant, who stated that her daddy and mother wanted her to come to Bearden, whereupon she got up and dressed, but did not put on her shoes as they had been left at the lunchroom to be polished; that she had on her panties and put on a white and blue striped dress that she was intending to wear to school the following morn-

ing. She then detailed how the defendant carried her into the woods and had sexual intercourse with her two or three times. There is no insistence that she was not raped. Neither is it seriously contended that the defendant is not the perpetrator of the crime.

The defendant admits spending the latter part of the night in the woods where the crime was committed, and admits changing clothes because they were muddy when he returned to his home between nine and ten o'clock that morning.

Nancy Ruth knew the defendant by sight but did not know his name. Upon her description of him and the clothes he was wearing the officers immediately began a search for the defendant and obtained the clothes he had taken off, and they fit the description given by Nancy Ruth. Thereafter Nancy Ruth identified defendant from photographs placed in her hands, and subsequently, when carried to the jail, out of a number of prisoners, designated defendant as the man who had assaulted her. She likewise pointed him out in the courtroom while she was testifying, and fully identified the clothes which he removed on returning to his home.

The defendant testified that he served in the United States Army in 1918-1919, and while so engaged sustained an injury when a horse fell on him; that in 1936, while digging a cistern, he sustained an injury to his back which has continuously caused him pain and suffering, and that as a result of this affliction he has contracted the habit of taking veronal and luminal tablets and drinking considerable quantities of whisky and beer; that while employed as a salesman for the Crisp Cream Doughnut Company he sold Mr. Sorrell doughnuts, and on occasions would talk to Nancy Ruth and give her doughnuts; that during the week preceding the day on which this crime

was committed he had been drinking heavily and taking a number of these tablets; that on the morning of September ninth before entering the Canary lunchroom he had taken two of these tablets and a drink of whisky; that while in that place he drank seven or eight bottles of beer and was drunk when he left; that he drove his car from this lunchroom to his home where he tried to back it into the garage, but that the motor died on him so that he could not get it into the yard; that he then drove his car down behind the post office where he took another drink of whisky and laid down in the front seat of his car, and from that time on was unconscious until he woke up in the woods several hours later.

The trial court instructed the jury that ordinarily voluntary drunkenness of an accused at the time a crime is committed is no defense, but that ''if drunkenness existed to such an extent at the time so that he had not sufficient understanding to know right from wrong, and was in a state of insanity by reason of long continued drunkenness, it would be an excuse,'' and they should acquit him.

There is no complaint as to this instruction, and defendant could not have asked for a more favorable charge.

Relative to voluntary intoxication as a defense, we quote from the very full text upon the subject appearing in 22 C. J. S., Criminal Law, section 66, as follows:

''It is a well settled general rule of the common law, and also generally followed under the statute, that voluntary drunkenness of an accused at the time a crime was committed is no defense; and that despite his voluntary drunkenness at the time one may, subject to the qualifications hereinafter pointed out, be guilty of any crime, such as assault, burglary, illegal possession of intoxi-

cating liquor, larceny, rape, or assault with intent to rape. If a person voluntarily drinks and becomes intoxicated, and while in that condition commits an act which would be a crime if he were sober, he is fully responsible, whatever may be the degree of his intoxication or the condition of his mind, even though the liquor may have been furnished by, or at the request of, the person against whom the crime is committed, unless his drunkenness had resulted in settled insanity, considered infra, section 70, as distinguished from mere drunkenness, or unless it rendered him incapable of entertaining a specific intent which is an essential ingredient of the offense, as discussed below in section 68. The effect of drunkenness on the mind and on men's actions when under the full influence of liquor are facts known to everyone, and it is as much the duty of men to abstain from placing themselves in a condition from which such danger to others is to be apprehended as it is to abstain from firing into a crowd or doing any other act likely to be attended with dangerous or fatal consequences. It can make no difference, where no specific intent is necessary, that the intoxication was so extreme that accused was unconscious of what he was doing and had no capacity to distinguish between right and wrong, and, although there may be no actual criminal intent, the law will, by construction, supply the same, except in cases where a specific intent is requisite.''

██ In the crime of rape no intent is requisite other than that evidenced by the doing of the acts constituting the offense. 52 C. J., 1014; 22 R. C. L. 1192; *Abbott* v. *Commonwealth*, 234 Ky., 423, 28 S. W. (2d), 486; *People* v. *Sheffield*, 9 Cal. App., 130, 98 P., 67; *People* v. *Gengels*, 218 Mich., 632, 188 N. W., 398; *State* v. *Hersh* (Mo. Sup.),

296 S. W. 433; *Zent* v. *State,* 3 Ohio App., 473; *State* v. *La Mont,* 23 S. D., 174, 120 N. W., 1104.

The rule thus announced finds support in the able and exhaustive opinion of Justice TURLEY, rendered nearly a century ago in *Pirtle* v. *State,* 28 Tenn. (9 Humph.), 663, in which it was held that voluntary drunkenness works no mitigation of crime except in a case where deliberation and premeditation is an essential element of the offense. In the opinion it is said:

"If the mental status required by law to constitute crime be one of deliberation and premeditation, and drunkenness or other cause excludes the existence of such mental state, then the crime is not excused by drunkenness or such other cause, but has not in fact been committed.

"This reasoning is alone applicable to cases of murder under our act of 1829, chap. 23. . . ."

Applying the foregoing principles to the facts of this case, if defendant was not drunk when he left the lunchroom, as testified to by the four parties present, but shortly thereafter became intoxicated to the extent that he unconsciously committed this horrible crime, then his drunken condition does not mitigate the crime and cannot be invoked as a defense.

With respect to defendant being afflicted with fixed or settled insanity, we find no evidence to support that contention. While some of his relatives and friends testify that he acts peculiarly and abnormally at times, the great weight of the testimony shows that ordinarily he is sane; and Dr. Hill, a mental specialist introduced as a witness by defendant, testified that he was sane and able to distinguish right from wrong. These were questions for the jury to decide, and we are unable to say that the evidence preponderates against the verdict.

After carefully reading and weighing the testimony, we are not impressed with the story of defendant that his mental status was such that he was not conscious of having committed this crime. After leaving the lunch-room he, quite likely, drank some whisky, as testified to by him, which inflamed his lustful passion, and knowing that this child was alone, and that her parents had motored to Knoxville, he proceeded to the Sorrell home, and had mind enough to concoct a story that led this child to get up, dress and follow him into the woods. His consciousness of guilt is evidenced by the fact that upon returning to his home he changed his clothes, and when the officers arrived purposely directed them to a place where he informed them he spent the night, which he subsequently admitted was five miles in the opposite direction from the place where he stayed. The defendant's testimony as to his whereabouts and conduct during the preceding week is coherent, connected and free from any mental aberration.

The defendant was represented by able and zealous counsel, was accorded a fair trial before an impartial jury; and while, in a sense, his act may have been partly due to his intoxication, he voluntarily brought about that condition and must abide the consequences.

We see no basis for interfering with the judgment of the trial court which will be affirmed, and the date of execution fixed for Thursday, January 15, 1942.