RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0168p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

BILLY R. IRICK,

        *Petitioner-Appellant,*

    *v.*

RICKY BELL, Warden, Riverbend Maximum
Security Institution,

        *Respondent-Appellee.*

No. 01-5638

———————————

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 98-00666—Curtis L. Collier, Chief District Judge.

Argued: December 11, 2008

Decided and Filed: May 12, 2009

Before: SILER, BATCHELDER, and GILMAN, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** C. Eugene Shiles, SPEARS, MOORE, REBMAN & WILLIAMS, Chattanooga,
Tennessee, for Appellant. James E. Gaylord, OFFICE OF THE ATTORNEY GENERAL,
Nashville, Tennessee, for Appellee. **ON BRIEF:** C. Eugene Shiles, SPEARS, MOORE,
REBMAN & WILLIAMS, Chattanooga, Tennessee, Howell G. Clements, CLEMENT &
CROSS, Chattanooga, Tennessee, for Appellant. James E. Gaylord, OFFICE OF THE
ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

    BATCHELDER, J., delivered the opinion of the court, in which SILER, J., joined.
GILMAN, J. (pp. 16-22), delivered a separate opinion concurring in part and dissenting in
part.

_____

**OPINION**

_____

ALICE M. BATCHELDER, Circuit Judge. Billy Ray Irick is on Tennessee's death row for the rape and murder of seven-year-old Paula Dyer. Irick appeals the district court's dismissal of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. He argues that prosecutors failed to provide defense counsel with a statement of the victim's mother, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and that the prosecutor committed misconduct during closing argument in the trial's penalty phase. Finding merit in neither argument, we **AFFIRM**.

**I.**

In April 1985, Irick was living with Kenneth Jeffers in Kenneth's mother's home in Knoxville, Tennessee. On the morning of April 15, Irick got into an argument with Kenneth's mother, and she chased him out of the house with a broom, telling him not to return. Later that day, around noon, Kenneth drove Irick to Irick's former workplace so he could pick up his final paycheck. Kenneth then took Irick to a convenience store, where Irick bought a quart of beer. After picking up Darrell Easterly, a mutual friend, the men went to the home of Kathy Jeffers, Kenneth's estranged wife. A couple of hours later, Kenneth picked up Kathy's children from school and took Easterly home. He later drove Irick to a nearby store so Irick could buy a second quart of beer, and the two then returned to Kathy's house.

That evening, around 9:00 p.m., Kenneth left to run some errands and visit some friends. Kathy put the children, including her daughter Paula, to bed and began getting ready for work. She noticed that Irick was on the back porch muttering to himself. Before she left, Kathy spoke with Irick for a few minutes in the kitchen. He "seemed mad" about the argument with Kenneth's mother and said that he could not hitchhike to Virginia that night as he wanted to because Kenneth had asked him to "watch the kids."

Kathy, who did not have a telephone in her home, briefly left the house to use a nearby pay phone to try to call Kenneth. When she could not reach him, she returned and

assured Irick that she would send Kenneth to her house to watch the children. She then left for work, arriving at the truck stop restaurant where she was a waitress at about 10:30 p.m. Kenneth came into the truck stop at about the same time, and she told him that she had "a bad feeling" about leaving Irick with the children and that she wanted Kenneth to go to the house and stay with the children instead. Kenneth laughed off her concern and promised that he would go check on them later.

Around midnight, Irick knocked on the door of Kathy's elderly neighbor, Wallace Bailey. When Ms. Bailey refused to open the door, Irick implored: "Well, it's an emergency. I want to use the phone. Paula is bleeding. I can't get her to wake up and breathe, and I want to use your phone." Ms. Bailey put the telephone on the porch, and Irick called Kenneth, telling him: "Kenny, come home. It's Paula. I can't wake her up." After the call, Ms. Bailey watched Irick walk back to Kathy's house, where he kicked a bucket and a little dog sitting on the porch, and then punched the porch post, saying loudly "Damn." Bailey asked Irick why he did not call an ambulance, and Irick responded in a subdued voice: "I think it's too late for that."

When Kenneth arrived at Kathy's house, he found Irick standing at the front door. Kenneth ran up the front steps to see Paula lying on the living room floor, blood between her legs. He wrapped the child in a blanket, carried her to his car, and sped to the hospital. After laboring for 45 minutes to resuscitate Paula, hospital personnel declared her dead at approximately 1:15 a.m. An autopsy would later reveal that Paula had been raped vaginally and anally, then asphyxiated. That afternoon, a police officer found Irick hitchhiking on an interstate entrance ramp. In a recorded conversation with police and also in writing, Irick confessed to raping and murdering Paula.

A jury found Irick guilty of felony murder and two counts of aggravated rape. Following the penalty phase of the trial, the jury returned a death sentence based on four aggravating circumstances: 1) the victim was less than 12 years of age and the defendant was 18 years of age or older; 2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; 3) the murder was committed for the purpose of avoiding, interfering with, or preventing Irick's lawful arrest or prosecution; and 4) Irick committed the murder while he was engaged in committing the felony of rape.

The Tennessee Supreme Court affirmed Irick's convictions and sentence on direct appeal.  Irick then sought post-conviction relief in the state courts.  Although both the trial court and the appellate court found the fourth aggravating circumstance — the felony murder aggravator — invalid, they found the error harmless beyond a reasonable doubt and denied relief.  In 1999, Irick filed a federal habeas petition in the Eastern District of Tennessee, raising 19 claims.  The district court granted the warden's motion for summary judgment, dismissed the petition, and denied the application for a certificate of appealability.  We granted Irick a certificate of appealability on the two issues now before us.

## II.

We review de novo the district court's legal conclusions in granting or denying a petition for a writ of habeas corpus; we review its factual findings for clear error.  *Slaughter v. Parker*, 450 F.3d 224, 232 (6th Cir. 2006) (citing *Smith v. Hofbauer*, 312 F.3d 809, 813 (6th Cir. 2002)).  Here, the district court granted summary judgment to the warden and made no findings of fact; our review, therefore, is entirely de novo.  And because Irick filed his habeas petition in 1999, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") apply.  *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999) (AEDPA applies to petitions filed after April 24, 1996).

AEDPA prohibits us from granting a state prisoner's habeas petition unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

"A state court decision is 'contrary to' clearly established Federal law if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a different result."  *Slaughter*, 450 F.3d at 232 (quoting *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005) (internal quotations omitted)).  A state court decision unreasonably applies federal law "if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts."  *Id.* (citing *Williams v. Taylor*, 529 U.S.

362, 407-08 (2000)). "[A] federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Bell v. Cone*, 535 U.S. 685, 694 (2002) (quoting *Williams*, 529 U.S. at 411). "'[T]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable — a substantially higher threshold.'" *Owens v. Guida*, 549 F.3d 399, 404 (6th Cir. 2008) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 127 S.Ct. 1933, 1939 (2007)).

"Where the state court disposes of a Federal constitutional claim with little-to-no articulated analysis of the constitutional issue, this circuit applies a modified form of AEDPA deference." *Hawkins v. Coyle*, 547 F.3d 540, 546 (6th Cir. 2008) (citations omitted). Under this modified-AEDPA standard, we "conduct[ ] a 'careful' and 'independent' review of the record and applicable law, but [we] cannot reverse 'unless the state court's decision is contrary to or an unreasonable application of federal law.'" *Vasquez v. Jones*, 496 F.3d 564, 570 (6th Cir. 2007) (quoting *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005) (other citation omitted)). In other words, we must "focus on the result of the state court's decision, applying" AEDPA deference to the result reached, not the reasoning used. *Harris v. Stovall*, 212 F.3d 940, 943 n.1 (6th Cir. 2000).

## III.

### A.     *Brady* Claim

The day after Paula's murder, Knoxville detectives interviewed Kathy Jeffers about Irick's behavior the night before:

> Q:     And so, you went to work at Hagaman's, and then the next time you saw your husband, where was that at?
>
> A:     He came in, I was getting ready to go to the phone. The girl I worked with, Donna, was there with me. I was going to call and see if he was at the other truck stop and tell him to go home, that Bill was drunk and talking crazy . . .
>
> Q:     Bill called you?

A:    No.  I went down early for a reason, to find Kenny and ask him to go home and stay with the kids.  But he walked in the door of Hagaman's . . .

Q:    Bill was drunk when you left home?

A:    I had to find somebody to stay with the kids.

Q:    Yeah, but Bill was intoxicated when you left?

A:    He wasn't drunk drunk, but he was well on his way.

At trial Kathy testified on direct examination that she had seen Irick drinking beer from a quart bottle and that he had been talking to himself.  When asked if Irick was intoxicated when she left for work, Kathy answered:  "No, I noticed more his being mad than anything else."  Kathy further testified that Irick was able to talk coherently and walk without stumbling.  During his closing argument in the penalty phase, the prosecutor stated: "I anticipate that the defense is going to suggest that he was acting under the influence of alcohol or marijuana.  Where's the proof of it? . . . No one has ever said he was intoxicated."

Irick argues that under *Brady v. Maryland*, 373 U.S. 83, the prosecution was obligated to turn Kathy's statement over to the defense and that their failure to do so deprived him of his Fourteenth Amendment right to due process.  In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Id.* at 87.  "'There are three components of a true *Brady* violation:  the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'"  *Owens*, 549 F.3d at 415 (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  A defendant is prejudiced when there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Kathy's statement that Irick was "drunk and talking crazy" on the night of the murder is favorable to him, Irick argues, for several reasons.  First, Irick contends that "evidence of intoxication may be admitted to negate the intent to commit the felony underlying the felony murder charge."  Second, he argues that "[e]vidence of intoxication

and/or mental illness was also clearly important in the penalty phase to show his actions as an aberration when viewed in the context that [Irick] was a trusted member of the Jeffers family prior to this incident." Third, Irick argues that he could have used Kathy's statement to impeach her after she testified that he seemed "mad" rather than intoxicated. Finally, Irick contends that if his attorneys had seen Kathy's statement that he was "talking crazy," they "would have more thoroughly investigated [Irick's] underlying mental condition . . . and found that [Irick] had experienced several psychotic episodes just prior to the incident."

On Irick's appeal from the state trial court's denial of his habeas petition, the Tennessee Court of Criminal Appeals did not specifically address his claim that the prosecution suppressed Kathy's statement to police. In his brief to that court, Irick addressed only some of the evidence he believed had been suppressed; for the rest, including Kathy's statement, he referred the court to his state petition for post-conviction relief, which originally had been filed in the state trial court. The Court of Criminal Appeals did not hold that Irick had forfeited his *Brady* challenges to the unbriefed evidence. In fact, that court discussed some of that evidence (but not Kathy's statement). *See Irick v. State*, 973 S.W.2d 643, 655-56 (Tenn. Crim. App. 1998).

On these facts, modified-AEDPA review is appropriate because in rejecting Irick's *Brady* challenges to the evidence it specifically addressed, the Tennessee Court of Criminal Appeals appears also to have rejected his challenge to Kathy's statement. We recognize, however, that this is a close case, and we have conducted the careful and independent review that is required under such circumstances. Even assuming *arguendo* that Kathy's statement is favorable to Irick and was suppressed by the prosecution, the state court's decision that Irick was not prejudiced by its suppression was not contrary to or an unreasonable application of federal law. Indeed, even if we reviewed this issue de novo as our dissenting colleague says we should, our conclusion would be no different.

### 1.     Evidence of Irick's intoxication could not have negated his intent to commit rape.

Irick argues that he could have used Kathy's statement to prove that he was intoxicated and thus unable to form the intent to commit aggravated rape, the predicate crime for his felony-murder conviction. Under Tennessee law, evidence of intoxication may be admitted "to negate the intent required in committing the felony underlying a felony murder

charge." *Wiley v. State*, 183 S.W.3d 317, 333 (Tenn. 2006) (citation omitted). "Voluntary intoxication is never a justification for a crime but its existence may negate a finding of *specific* intent." *State v. Adkins*, 653 S.W.2d 708, 713 (Tenn. 1983) (emphasis added) (citation omitted). Prior to Tennessee's adoption of the Criminal Sentencing Reform Act of 1989, "the offense of aggravated rape was a 'general intent' crime, for which a culpable mental state was necessary, but easily inferable from the conduct which comprises the offense." *Dykes v. Compton*, 978 S.W.2d 528, 530 n.2 (Tenn. 1998) (citations omitted); *see also Walden v. State*, 156 S.W.2d 385, 387 (Tenn. 1941) ("In the crime of rape no intent is requisite other than that evidenced by the doing of the acts constituting the offense." (citations omitted)). The statute under which Irick was convicted, Tenn. Code Ann. § 39-2-603 (1979), defined aggravated rape as the "unlawful sexual penetration of another" accomplished under certain aggravating circumstances — in this case, the penetration of a child less than 13 years of age. *See Dykes*, 978 S.W.2d at 530. Whether Irick was drunk or not, the fact that he sexually penetrated Paula Dyer is itself sufficient to prove the requisite *mens rea*. Even if Kathy Jeffers's statement could have established Irick's intoxication, it could not have negated his intent to commit aggravated rape, and thus could not have undermined his felony murder conviction.

> **2.      There is no reasonable probability that Irick's sentence would have been different had he introduced Kathy Jeffers's statement in the penalty phase.**

Irick argues that Kathy's statement would have shown that his actions on the night of April 15, 1985, were an "aberration" from his true character as a trusted family friend. At trial Kathy testified that before the night of Paula's murder she had often let Irick babysit her children because she trusted him and had a relationship with him "like brother and sister." That night, however, he was "really angry" and acted "like he was wanting to strike out at something," and she "had never seen him like that before." Kenneth also testified that Irick previously had been good to the children. The jury heard Kathy testify that Irick had been drinking and was talking to himself before she left for work, and they heard Kenneth testify about the amount of alcohol Irick had purchased that day. The jury thus heard evidence about Irick's past treatment of the Jefferses' children, about his drinking two quarts of beer over the course of the day, and about his strange behavior that night. Kathy's statement that Irick was "drunk and talking crazy" would have been, at best, cumulative of

this other evidence, and we cannot say that the fairness of the penalty phase was undermined by its absence.

**3.** **There is no reasonable probability that the verdict would have been different had Irick used Kathy Jeffers's statement to impeach her trial testimony.**

During the trial's guilt phase, Kathy testified that she could not tell that Irick was intoxicated on the night of the murder; she said she "noticed more his being mad than anything else." Irick argues that he could have impeached her with her statement to police that Irick was "drunk and talking crazy." Although Irick could have used the statement to try to impeach Kathy's credibility, we cannot say there is a reasonable probability that he would have been acquitted had he done so. Even in her interview with police, when asked if Irick was intoxicated, Kathy qualified her earlier comment that he was "drunk" by explaining that he was not "drunk drunk, but he was well on his way." So, both in her statement and in her trial testimony, Kathy refused to affirm that Irick was "intoxicated." And her statement that Irick was "well on his way" to being drunk was not inconsistent with her testimony that Irick was angry and talking to himself but still able to talk coherently and walk without stumbling.

**4.** **Irick's argument that Kathy Jeffers's statement would have led his counsel to uncover favorable evidence of his mental condition is procedurally barred.**

Had his counsel seen Kathy's statement that Irick was "talking crazy," Irick contends, they would have further investigated his mental condition and discovered that he had demonstrated a pattern of disturbing behavior prior to the murder. In support of this contention, Irick points to affidavits sworn in 1999 from Kenneth Jeffers's family members. Ramsey Jeffers, Kenneth's father, stated that "sometime immediately before April 15, 1985" he found Irick in the hallway of his home carrying a machete and threatening to kill Kenneth. Linda Jeffers, Kenneth's mother, stated that she saw Irick chase a school-age girl down the street with a machete because he did not like her looks. Cathy Jeffers, Kenneth's sister, stated that Irick had told her that he had been "talking with" and "taking instructions from" the devil and that "the only person that tells me what to do is the voice." Irick suggests that uncovering this information would have led him to mount a successful insanity defense or at least would have provided mitigating evidence for the penalty phase.

Irick did not present this argument to the state courts. In fact, the Jefferses' affidavits were not signed until after all state proceedings had ended. A federal habeas petitioner "must first exhaust the remedies available in state court by fairly presenting his federal claims before the state court; the federal court will not review unexhausted claims." *Murphy v. Ohio*, 551 F.3d 485, 501 (6th Cir. 2009) (citing *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 431 (6th Cir. 2006)). "A federal court will not review claims that were not entertained by the state court due to . . . the petitioner's failure to raise those claims in the state courts while state remedies were available . . . ." *Id.* (citing *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006)). Because Irick did not present this issue to the Tennessee courts, he is barred from raising it here.

Moreover, granting Irick habeas relief based on this argument would require us to accept a cascade of entirely speculative premises: had his counsel seen Kathy's statement that he was "talking crazy" the night of the murder, they would have launched an investigation into his mental condition that they otherwise would not have undertaken; his attorneys would have interviewed Kenneth's family, something they would not have done absent this investigation; they would have called these or other witnesses, perhaps experts, to the stand; and the jury would have accepted their testimony and acquitted Irick or withheld the death penalty. We cannot say that either singly or together these premises amount to a reasonable probability that Irick's verdict or sentence would have been different.

**B.     Prosecutorial Misconduct**

Irick argues that the prosecutor committed three forms of misconduct during closing argument in the penalty phase. First, he argues that the prosecutor advocated general deterrence as a basis for imposing the death penalty. Second, he argues that the prosecutor expressed his personal beliefs regarding the effectiveness of the death penalty as a general deterrent. Third, he contends that the prosecutor implied that Irick had previously committed acts similar to the offense for which he was on trial.

In an evaluation of alleged prosecutorial misconduct the "correct inquiry is whether the improper comments or actions 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Slagle v. Bagley*, 457 F.3d 501, 515 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). We use a two-part test

to determine whether the state court reasonably applied the federal standard in holding that prosecutorial misconduct did not render Irick's trial fundamentally unfair. *Id.* First, we determine whether the prosecution's conduct was improper. *Id.* at 516. If it was, we then consider four factors to decide whether the improper acts were flagrant, thus requiring reversal: "(1) whether the evidence against the defendant was strong; (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally." *Id.* We have recognized that "the Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)).

### 1.       General Deterrence[1]

In his rebuttal closing argument in the penalty phase, the prosecutor told the jury:

> [W]ith your verdict, you make a statement about things whether you realize it or not. You will make a statement about the value of Paula's life. You will make a statement about what this man did and your willingness to tolerate it. You will make a statement to everybody else out there what is going to happen to people who do this sort of thing. Some of you may believe that punishment is a deterrence. Some of you may not. I don't know. I personally believe that it is. . . . [T]here comes a time in society when we have a right to defend ourselves. I suggest to you that it is more than a right to defend ourselves in this kind of a situation where there is a child involved. We have a duty to defend . . . our families, and our homes and our children. That is what this case is about.

On direct review, the Tennessee Supreme Court held that "[u]nquestionably, any argument based on general deterrence to others has no application to either aggravating or mitigating circumstances" and "is inappropriate at a sentencing hearing." *State v. Irick*, 762 S.W.2d 121, 131 (Tenn. 1988). That court nonetheless held that the prosecutor's comments were "moderate at most" and did not warrant reversal. *Id.*

---

[1] Because the prosecutor expressed his personal belief in the context of making a general deterrence argument, we will consider the two together.

We are not convinced that the prosecutor's general deterrence argument was improper. At the time of the Tennessee Supreme Court's decision, the United States Supreme Court had never held that appeals to general deterrence are impermissible in sentencing arguments. In fact, several of our sister circuits had explicitly held otherwise.[2] *See, e.g., Davis v. Kemp*, 829 F.2d 1522, 1527 (11th Cir. 1987) ("Arguments by the prosecutor that the death penalty serves as a deterrent are proper." (citation omitted)); *Brooks v. Kemp*, 762 F.2d 1383, 1407 (11th Cir. 1985) (en banc), *vacated on other grounds*, 478 U.S. 1016 (1986), *reinstated*, 809 F.2d 700 (11th Cir.1987) ("In deciding whether to impose the death penalty in a particular case, it is appropriate for a jury to consider whether or not the general deterrence purpose of the statute would be served thereby." (citation omitted)); *Coleman v. Brown*, 802 F.2d 1227, 1239 (10th Cir. 1986) ("[C]omments concerning the penological justifications for the death penalty, i.e., retribution, incapacitation, and general deterrence, are appropriate." (citations omitted)); *Welcome v. Blackburn*, 793 F.2d 672, 679 (5th Cir. 1986) (providing that "[w]hile the prosecutor's closing argument touched on the prospect of general deterrence, it also emphasized [the defendant's] actions and the jury's responsibility to make a sentencing determination that applied the death penalty to [the defendant's] individual case" and did not render the trial fundamentally unfair (citation omitted)).

As for the prosecutor's comment that he "personally believe[d]" the death penalty was a deterrent, "[i]t is well established that the personal opinion of counsel has no place at trial." *United States v. Collins*, 78 F.3d 1021, 1039 (6th Cir.1996) (citation omitted). Even so, in this case the prosecutor did not vouch for a witness, personally

---

[2]The dissent cites two of this court's decisions to show "that, in *this* circuit, general-deterrence arguments are disfavored." Dissenting Op. at 21 (emphasis in original). In *United States v. Solivan*, 937 F.2d 1146, 1150-53 (6th Cir. 1991), we held that it was improper for a prosecutor, during closing argument in a trial's guilt phase, to suggest to the jury that a community drug problem would continue if they did not convict the defendant. The danger, we held, was that the jury might render a verdict of guilty based on their desire "to end a social problem" instead of their decision that the individual defendant was guilty beyond a reasonable doubt of the crime charged. *Id.* at 1153. That case is distinguishable from the situation here, where Irick had already been convicted and defense counsel had conceded that at least one aggravating factor had been established. And in *Byrd v. Collins*, 209 F.3d 486, 538-39 (6th Cir. 2000), we held that the petitioner had failed to raise and that "we need not consider" his claim that the prosecutor impermissibly argued that the jury "should impose the death penalty on Petitioner in order to fulfill their societal duty." We went on to note that, in any event, it was "not clear that [the prosecutor's] comment was even improper, and it certainly [did] not render Petitioner's entire trial fundamentally unfair." *Id.* at 539. These cases do not establish that the prosecutor's statements here were improper under our caselaw.

comment on the credibility or weight of the evidence, or suggest that he had personal knowledge of facts not before the jury. He simply acknowledged that there were differences of opinion on the efficacy of capital punishment as a deterrent and shared where he stood in the debate.

Even if the general-deterrence line of argument was improper, it was not flagrant. First, the evidence against Irick in the penalty phase — proof of aggravating circumstances — was strong. Indeed, defense counsel acknowledged to the jury that it would be "foolish" for him to argue that the prosecution had not proven at least one aggravating circumstance beyond a reasonable doubt: the fact that Paula Dyer was under 13 years of age and that Irick was 18 years of age or older. Second, the prosecutor's comments did not tend to mislead the jury or prejudice Irick. The mere fact that a comment was improper does not itself establish prejudice. If it did, there would be no need for a two-step inquiry. In light of the gruesome facts of Paula's murder and the overwhelming evidence of aggravators, Irick has not shown how the prosecutor's appeal to deterring others or protecting families has prejudiced him. Third, the comments were limited to the rebuttal portion of the prosecutor's closing and did not make up an extensive part of his argument. Fourth, although the remarks were deliberate rather than accidental, the balance of these factors leads us to agree with the state court that any impropriety here was "moderate at most."

### 2.       Prior Bad Acts

Also in his penalty phase rebuttal, the prosecutor stated:

Should we be surprised to hear these people get up here today and say, "When Billy Irick is angry or moody, he wants to hurt something. He wants to hurt somebody." We knew that, didn't we? We knew that, on April 15, 1985, he was upset. It doesn't appear to us to be anything significant, does it? But it just doesn't suit Billy Ray Irick, so he is moody, and he is grumbling. He is talking under his breath. Things aren't going his way.

And he takes it out on a seven year old child. We knew that about Billy Irick before Ms. Lunn or Dr. Tennison ever hit that witness stand. What we didn't know is he has been doing it for a long time.

Irick argues that the prosecutor was suggesting Irick had previously committed violent crimes other than the ones for which he was on trial.

The Tennessee Supreme Court found that the prosecutor seemed "to make reference to the testimony of certain of the witnesses who indicated defendant had a tendency to behave violently toward others on occasion." *Irick*, 762 S.W.2d at 132. This finding is not an unreasonable determination of the facts. The context of the prosecutor's statement was that Irick had a tendency to hurt "somebody" or "something" when he was angry or did not get his way.

Nina Lunn, a licensed social worker, met with Irick when he was a child patient at the Mental Health Center of Knoxville and Eastern State Mental Hospital. In an intake report taken in 1965, Lunn described Irick as "overly aggressive" and "difficult to manage," and noted that he "mistreats animals." Lunn told the jury that "during that period of time when [she] worked with [Irick]" he showed "patterns of behavior" in which he would become "very moody" and "more aggressive, if not, you know, attacking of the staff and those kinds of things."

Dr. Clifton Tennison, Jr., a psychiatrist, testified that his examination of Irick left him with "a strong diagnostic impression" that Irick had an anti-social personality disorder. Dr. Tennison described personality disorders generally as "long-term, maladaptive, fixed, deep-ingrained responses to stress in the environment." He described anti-social personality disorder as being characterized by "an unwillingness or an inability to take into account the rights of other people."

Part of the defense theory at sentencing was that, in raping and murdering Paula, Irick tragically but temporarily deviated from his nonviolent character. In closing argument defense counsel stated:

> Billy has been able to stay out of trouble with the law as an adult. I think that is important. I think that shows some hope that Billy is not all bad. I mean, he was able to go for a number of years and not even get arrested for even a misdemeanor that involves moral turpitude.

On the day of the murder Irick had lost his job and home, had been drinking, and may have smoked some marijuana, defense counsel noted. In response, the prosecutor pointed to Lunn's and Tennison's testimony and argued that Irick had a long history of aggressive behavior and an ingrained tendency to please himself at the expense of others. Under this interpretation of his statement, which the state court reasonably adopted, the prosecutor did nothing wrong.

Even if the comment was somehow improper, it was not flagrant. As explained above, the evidence against Irick was overwhelming. Because the prosecutor's reference to Irick's "doing it for a long time" was at worst vague, it did not tend to mislead the jury or prejudice Irick. The comment was isolated, and its context shows that the prosecutor did not intend to suggest that Irick had committed other, uncharged crimes.

Finally, the allegedly improper comments did not, in the aggregate, render Irick's trial fundamentally unfair. Any cumulative effect was minimal, given the mountain of evidence against him. *See Slagle*, 457 F.3d at 523-28 (15 improper comments, even when taken together, did not render trial unfair). The state court reasonably applied federal law in holding that the statements did not call for habeas relief.

## IV.

For the reasons stated above, we **AFFIRM** the district court's judgment.

_____

**CONCURRING IN PART AND DISSENTING IN PART**
_____

RONALD LEE GILMAN, Circuit Judge, concurring in part and dissenting in part. I agree with the majority that Billy Ray Irick's conviction is free of constitutional error. Nonetheless, I write separately on this issue because I believe that the majority has applied the wrong standard of review to Irick's *Brady* claim. In my view, that claim should be reviewed de novo. Even under the de novo standard, however, I reach the same conclusion as the majority on the *Brady* issue.

I cannot agree, however, that Irick's death sentence passes similar constitutional muster. In particular, the prosecutor's improper closing argument at the penalty phase of the case—urging the jury to sentence Irick to death in order "to defend ourselves, . . . our families, . . . our homes, and our children"—went beyond the pale and "so infected the trial with unfairness" as to make the resulting sentence a denial of due process. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Lundgren v. Mitchell*, 440 F.3d 754, 778 (6th Cir. 2006) (noting that where prosecutorial misconduct occurs during the sentencing phase of a capital case, the *Darden* inquiry becomes "whether the constitutional error influenced the jury's decision between life and death"). I address below both the standard of review regarding the *Brady* issue and the merits of the prosecutor's improper closing argument.

## I. IRICK'S *BRADY* CLAIM

Only one piece of evidence that was excluded at Irick's trial is relevant to this appeal: Kathy Jeffers's statement that Irick was "drunk and talking crazy" on the night of the murder. Because I agree with the majority's conclusion on this *Brady* claim, I concur in the result reached in Part III.A. of the majority opinion. I disagree, however, with the majority's application of AEDPA deference to Irick's *Brady* claim.

The majority acknowledges that "the Tennessee Court of Criminal Appeals did not specifically address [Irick's] claim that the prosecution suppressed Kathy's statement

to the police." (Maj. Op. at 7)  As the majority explains, Irick did not brief his *Brady* challenge to the exclusion of this particular piece of evidence to that court, but instead incorporated the argument by reference to his postconviction petition filed with the state trial court.  (*Id.*)  The Tennessee Court of Criminal Appeals did not even allude in its opinion to the existence of the argument.

Nevertheless, the majority applies "modified AEDPA review" because, in its view, "in rejecting Irick's *Brady* challenges to the evidence it specifically addressed, the Tennessee Court of Criminal Appeals appears to have also rejected his challenge to Kathy's statement." (*Id.*)  The majority thus attempts to fit the present case—where a constitutional claim apparently fell through the cracks during the state-court postconviction proceedings—into this circuit's line of "modified AEDPA deference" caselaw.  *See, e.g.*, *Hawkins v. Coyle*, 547 F.3d 540, 546 (6th Cir. 2008)  ("Where the state court disposes of a Federal constitutional claim with little-to-no articulated analysis of the constitutional issue, this circuit applies a modified form of AEDPA deference.").

But the "modified AEDPA deference" line of cases, in my opinion, treads a precarious path in light of the Supreme Court's decisions in *Rompilla v. Beard*, 545 U.S. 374 (2005), and *Wiggins v. Smith*, 539 U.S. 510 (2003).  In these two cases, the Supreme Court applied de novo review to the prejudice prong of ineffective-assistance-of-counsel claims under *Strickland v. Washington*, 466 U.S. 668 (1984).  The Court did so because the state courts in both *Rompilla* and *Wiggins* had held that counsel's assistance was not ineffective, and therefore had not reached the prejudice prong of the *Strickland* test. *Rompilla*, 545 U.S. at 390 ("Because the state courts . . . never reached the issue of prejudice, . . . we examine this element of the . . . claim *de novo* . . . ."); *Wiggins*, 539 U.S. at 534 (conducting a de novo review of the *Strickland* prejudice issue under the same circumstances).  This circuit thus applies *more* deference to state courts in modified-deference cases like *Hawkins*, where the state court denied the constitutional claim without providing any indication that it had even considered the claim, than did the Supreme Court in *Rompilla* and *Wiggins*, where the state courts provided a thorough analysis of at least the first prong of the relevant claim.  The inconsistency in this

approach strikes me as troublesome at best, and I conclude that applying de novo review to perfunctory state-court conclusions in cases like *Hawkins* would align more closely with the Supreme Court's decisions.

Moreover, even if the modified-AEDPA-deference standard might be appropriate in some cases, this is not such a case. In *Hawkins* and other modified-AEDPA-deference cases, the state courts articulated a conclusion on the constitutional issue—albeit without undertaking rigorous analysis. *See Hawkins*, 547 F.3d at 547 ("[I]f appellant's arguments are considered on the merits, appellant has failed to satisfy his burden of establishing ineffective assistance under . . . [*Strickland*]." (quoting *State v. Hawkins*, 612 N.E.2d 1227, 1234 (Ohio 1993) (alteration in original)). Here, in contrast, the state court did not even *mention* the "drunk and talking crazy" statement that is the subject of the *Brady* claim now before us. Under these circumstances, I conclude that the constitutional claim should receive de novo review. *See, e.g.*, *Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006) ("When a state court fails to address the petitioner's federal claim, we review the claim de novo."); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) ("Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.").

Application of de novo review, however, brings me to the same conclusion reached by the majority's "careful and independent review" of the record and applicable law. (Maj. Op. at 7) As the majority thoroughly explains, introduction of the "drunk and talking crazy" statement would not have undermined the intent element of Irick's conviction. (Maj. Op. at 8) I thus part ways with my colleagues on this issue only in my belief that AEDPA deference does not apply to implied "conclusions" that the state court never made. Where we must assume that the state court rejected a particular claim because the state court is silent, I believe that we should review the claim without *any* deference, modified or otherwise. *See Maples v. Stegall*, 340 F.3d at 437.

## II.  PROSECUTORIAL MISCONDUCT AT THE PENALTY PHASE

I turn now to Irick's claim that the prosecutor's general-deterrence argument introduced fundamental unfairness into the penalty phase of the trial.  The final three paragraphs of the prosecutor's rebuttal closing argument at the penalty phase read as follows:

> But what about other people?  Because, with your verdict, you make a statement about things whether you realize it or not.  You will make a statement about the value of Paula's life.  You will make a statement about what this man did and your willingness to tolerate it.  You will make a statement to everybody else out there what is going to happen to people who do this sort of thing.  Some of you may believe that punishment is a deterrence.  Some of you may not.  I don't know.  I personally believe that it is.  I will tell you why, and this is not an original thought.  But I have heard this comment made, and I guess it all depends on how you are turned [sic]—how you look at the world.
>
> Someone said that the death penalty is, sort of, like a lighthouse.  You don't know how many ships have been saved by its beacon.  You can't count that.  You only know the ones that disregarded its warning.  Those, you count.  Those are the Billy Ray Iricks.
>
> I know this is a hard decision, ladies and gentlemen, but there comes a time in society when we have the right to defend ourselves.  I suggest to you that it is more than a right to defend ourselves in this kind of situation where there is a child involved.  We have a duty to defend ourselves, a duty to defend our families, and our homes, and our children.  That is what this case is about.  And our law is now being entrusted into your care.  Thank you.

These final words from the prosecutor were improper for a number of reasons. To start with, they were deliberately made despite Irick's preargument request that the court instruct the prosecutor not to make a general-deterrence argument.  Moreover, the argument is misleading because general deterrence has nothing to do with the proper weighing of aggravating and mitigating circumstances.  The Tennessee Supreme Court agreed that the prosecutor's argument in the present case was improper for this reason, stating that "[u]nquestionably, any argument based on general deterrence to others has no application to either aggravating or mitigating circumstances.  Argument of this nature is inappropriate at a sentencing hearing."  *State v. Irick*, 762 S.W.2d 121, 131

(Tenn. 1988). In my view, the majority oversteps its role by second-guessing the Tennessee Supreme Court's explicit conclusion on this question of state law. *See Cristini v. McKee*, 526 F.3d 888, 897 (6th Cir. 2008) ("We must accept as valid a state court's interpretation of the statutes and rules of practice of that state." (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)).

The majority cites cases from three of our sister circuits to support its contention that appeals to general deterrence might be appropriate at the sentencing phase of a death penalty case. Although federal cases are not relevant in light of Tennessee's unambiguous conclusion that the prosecutor's argument was improper, I note that, in *this* circuit, general-deterrence arguments are disfavored, especially where, as here, the argument is "calculated to inflame passion and prejudice." *See, e.g.*, *United States v. Solivan*, 937 F.2d 1146, 1150-53, 1155 (6th Cir. 1991) (holding that a prosecutor's entreaty in closing argument to convict a defendant in order to "send a message and strike a blow to the drug problem" was "a single misstep so destructive to defendant's right to a fair trial that it constitute[d] reversible error."); *cf. Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000) (holding that a prosecutor's comment that jurors "should impose the death penalty . . . in order to fulfill their societal duty" was not improper because the prosecutor "d[id] not ask the jury to send a message to other potential murderers or robbers").

Finally, the prosecutor expressed his personal belief in the effectiveness of general deterrence. But "prosecutors are prohibited from expressing their personal opinion as to . . . the appropriateness of the death penalty." *Bates v. Bell*, 402 F.3d 635, 644 (6th Cir. 2005). The reason for this rule is that "[j]urors are mindful that the prosecutor represents the State and are apt to afford undue respect to the prosecutor's personal assessment." *Id.*

Despite its clear holding that the prosecutor's closing argument was improper, the Tennessee Supreme Court concluded that the argument did not reach the level of reversible error for the following reasons: "The comments were moderate at most. The trial court correctly and positively instructed the jury in reference to aggravating and

mitigating circumstances.  Defendant did not challenge the sufficiency of the evidence of his guilt.  The evidence was devastating against him and was supplemented by his own confession." *Irick*, 762 S.W.2d at 131.

This brief justification for finding the prosecutorial misconduct harmless is, in my opinion, so unpersuasive as to be unreasonable.  *See Williams v. Taylor*, 529 U.S. 362, 409 (2000) ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.").  First of all, the comments were not "moderate."  They were an extended emotional appeal for the jurors to protect themselves and the community at large from persons of Irick's ilk, and they came at the very end of the state's argument, with no chance for rebuttal by the defense.  Nor did the trial court's jury instructions cure the taint, since they were devoid of any indication that the jurors should disregard the prosecutor's improper appeal to an irrelevant consideration in their decision as to whether Irick should live or die.  Finally, the fact that Irick did not challenge the overwhelming evidence of his guilt for the underlying crime has no bearing on the jury's proper role in weighing the mitigating factors presented at the sentencing phase of his trial.

Irick's crime was indeed a heinous one that the jury could well find deserved the death penalty.  But how confident can we be that, in the absence of the prosecutor's improper appeal to general deterrence, not a single juror would have considered the mitigating circumstances presented—Irick's lack of any prior felony conviction, his history of mental impairment, his close relationship with the victim's family, and his remorse—and decided that life without parole was the appropriate punishment for Irick? As the Supreme Court said in *Caldwell v. Mississippi*, 472 U.S. 320, 341 (1985), if the court "cannot say that [the prosecutor's comments] had no effect on the sentencing decision," then the jury's decision "does not meet the standard of reliability that the Eighth Amendment requires."

There is no doubt in the present case that the prosecutor's final words to the jury were, as acknowledged by the Tennessee Supreme Court, "inappropriate."  The sole

question then is whether this inappropriate conduct "influenced the jury's decision between life and death." *Lundgren v. Mitchell*, 440 F.3d 754, 778 (6th Cir. 2006). The prosecutor in this case injected an improper consideration—the death penalty's alleged effectiveness to deter other heinous murders of young children—into the balance between aggravating and mitigating factors. A juror could hardly be expected to ignore this powerful emotional appeal to an irrelevant factor, especially in the absence of an appropriate instruction from the court.

Because I believe that there is a reasonable probability that at least one juror would have reached a different outcome as to Irick's sentence in the absence of the prosecutor's misconduct, I conclude that the state court's ruling to the contrary was an unreasonable application of federal law as declared by the Supreme Court. *See Bell*, 402 F.3d at 649 ("If a habeas court is in 'grave doubt' as to the harmlessness of an error, the habeas petitioner must prevail."); *Skaggs v. Parker*, 235 F.3d 261, 271 (6th Cir. 2000) ("[A] petitioner need not prove by a preponderance of the evidence that the result would have been different, but merely that there is a reasonable probability that the result would have been different." (citing *Williams*, 529 U.S. at 371)). I would therefore grant Irick's petition for a writ of habeas corpus as to his death sentence, conditioned on the state of Tennessee retrying the penalty phase of the case without the taint of the prosecutor's general-deterrence argument.